IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | CRIMINAL NO. **08-ESH-0111** |
| | **:** | |
| **ROBERT E. COUGHLIN II** | **:** | |

....................................................oOo.......................................................................

### Government's Sentencing Memorandum and 5K1.1 Motion

I.   **Coughlin's Sentence and Fine Should Reflect the Seriousness of His Offense, Promote Respect for the Law, Provide Just Punishment and Adequately Deter Future Criminal Conduct.**

Department of Justice official Robert Coughlin violated the public trust when he took thousands of dollars of free meals, drinks, tickets to concerts and sporting events, and a round of golf from a lobbyist who was lobbying him about matters at the DOJ.  Ex. 1 (plea agreement); Ex. 2 (statement of the offense) at 3-9.  Coughlin further violated that trust by repeatedly meeting with the lobbyist to discuss working at the lobbying firm – all while continuing to help him lobby DOJ.  Ex. 2 at 3-9.  Although he pled guilty to a felony conflict of interest in violation of 18 U.S.C. §§ 208 & 216(a)(2),  Ex. 1, Coughlin fails fully to acknowledge that he has committed a serious crime.  He does so in five ways.

A.   **Coughlin Solicited and Accepted Illegal Gratuities.**

First, the gifts Coughlin took from lobbyist Kevin Ring were given because of Coughlin's official actions.  Ex. 3 (Government's Opposition to Defendant's Motion to Strike Exhibits and Exclude Witnesses, United States v. Ring, no. 08-ESH-274, doc. 90) at 2.  For example, in February 2003, at Ring's request, Coughlin sought to have the Immigration and Naturalization Service expedite the inspection of a school owned by Jack Abramoff.  Ex. 2 at 9.  When INS

1

agreed, Ring wrote "I cannot thank you enough for helping on this.  Jack was very appreciative.

You really helped me out."  Ex. 2 at 9; Ex. 4 (email) at 1.  In the same e-mail chain, Coughlin

responded to Ring: "Hey man.  I have a favor to ask.  Any way I can hit you up for Wizards

tickets (4) on the 15th and 18th of March?"  Ex. 2 at 9; Ex. 4 at 1.  Coughlin had never before

requested this many tickets from Ring – but as a reward, Ring and Abramoff gave Coughlin the

eight tickets.  Ex. 5 (email).

 Coughlin accepted dozens of free meals and drinks at expensive restaurants, free tickets

to concerts and sporting events, and a round of golf from Ring – estimated to amount to more

than $6,000.  Ex. 2 at 8; Section IV.A., infra.  Yet year after year, Coughlin filed false financial

disclosure forms on which he failed to disclose the gifts he was receiving.  Ex. 2 at 8.

 Coughlin concedes now, looking at the e-mails in hindsight, that these gifts were illegal

gratuities.  Ex. 3 at 2, 7.  In his statement of the offense, Coughlin acknowledged that he

"personally received these things of value from [Ring] otherwise than as provided by law for the

proper discharge of official duty, for or because of official acts performed or to be performed by

Coughlin in his capacity as a DOJ liaison."  Ex. 2 at 8-9.  Yet Coughlin steadfastly refuses to

acknowledge that at the time, he recognized that Ring was giving him these gifts because of his

official acts.

 Coughlin also minimizes the value of these gifts.  He recently told the probation officer

that the gifts "amount[ed] to around $4,000," PSR at 10, whereas in the statement of the offense

he estimated that the gifts were worth "approximately $4,800," Ex. 2 at 8 – both of which figures

underestimate their value.  See Section IV.A., infra.

**B.      Coughlin Knew That He Was Using His DOJ Office to Help Ring's Clients.**

Second, Coughlin knew that he was using his DOJ office to help Ring's lobbying clients, yet he now claims that he "had absolutely no idea that Kevin was leveraging our relationship for client purposes." PSR at 11.  The evidence contradicts Coughlin's claim.  For example, in April 2002 he agreed to have dinner with Ring and a client, at Ring's expense, "just . . . to fill [the client's] schedule with meetings." Ex. 2 at 9, 4.  In April 2001, Coughlin agreed to attend a lobbying meeting with Ring at DOJ after Ring wrote "it would be good if you were there so some of the clowns there know that I have friends."  Ex. 2 at 5.  And Coughlin repeatedly helped Ring with other lobbying matters that Ring's clients had before the DOJ.  Ex. 2 at 3-7.

**C.      Coughlin Violated His Duties to DOJ.**

Third, Coughlin's assistance to Ring violated his duties to DOJ, even apart from the gifts he was accepting.  See, e.g., 5 C.F.R. §§ 2635.101(b)(8) ("Employees shall act impartially and not give preferential treatment to any private organization or individual.") & 2635.101(b)(3) ("Employees shall not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interest.").  Coughlin has recently claimed that at the time of his actions, he "did not believe that he acted other than in the government's best interests" and he "did not believe he was treating Mr. Ring preferentially." Ex. 6 (letter) at 1.  These claims are difficult to square with the e-mail evidence.  For example, after an April 2001 dinner at Olive's at Ring's expense, Coughlin offered to help Ring come up with a strategy to reverse a DOJ grant decision.  Coughlin wrote:

> Let's talk some more about that [tribal-jail-grant] money.  I know we touch[ed] on it on Thursday night [at the dinner at Olive's], but maybe we could come [up] with some strategy in order to make sure they get the rest of the money.

Ex 2 at 6.  Coughlin then attempted to steer Ring toward DOJ officials who Coughlin thought would be friendly to Ring.  Ex. 2 at 6-7.  When Coughlin thought that a DOJ official who was supposed to handle Ring's jail-grant issue might <u>not</u> be favorably inclined toward Ring, he went so far as to offer to Ring: "this is her issue but let me know if you would rather not have her attend [a meeting] and I will take care of it."  Ex. 2 at 5.  And on repeated occasions, Coughlin shared nonpublic DOJ information with Ring to help Ring's lobbying efforts.  <u>E.g.</u>, Ex. 3 at 7.

### D.      Coughlin Blames a DOJ Ethics Official for His Violations.

Coughlin contends that a DOJ ethics official authorized him to seek and accept these gifts from Ring because Ring was his friend.  Ex. 6 at 1.  However, the ethics official in question denied that she would have given such blanket authorization, as such advice would have been completely wrong – the "friendship exception" to the rule against accepting gifts from a prohibited source generally applies only to gifts paid for by the friend <u>personally</u>, not gifts paid for by the lobbying firm.  <u>See</u> 5 C.F.R. § 2635.204(b).  Moreover, neither the "friendship exception" nor any other exception to the gift rules allows a DOJ official to <u>solicit</u> a gift from a lobbyist with business before DOJ.  <u>See</u> 5 C.F.R. § 2635.202(c).  Coughlin solicited more than a dozen tickets from Ring.  Ex. 2 at 8 (referencing tickets to "two concerts"); ex. 2 at 9 (soliciting eight Wizards tickets); Ex. 7 (e-mail) (soliciting four Wizards tickets).

Coughlin was required by DOJ to attend annual, mandatory ethics training.  Moreover, he was Department of Justice lawyer and therefore knew that ignorance of the law is no excuse for its violation.  He should have known to pay attention to the ethics rules and to follow them.

### E.      Coughlin's Crimes Deserved to Prosecuted.

Finally, despite nominally accepting responsibility for his crimes, Coughlin maintains that

he never should have been prosecuted for these crimes at all.  Ex. 6 at 1.  Coughlin has claimed that the failure to prosecute certain other former DOJ officials demonstrates that he was "unfairly singled out" – despite the fact that Coughlin claims to <u>have no</u> incriminating information regarding these other officials.  Both parties agree that the Guidelines sentencing range is 0 to 6 months' imprisonment.  In deciding the sentence and fine to be imposed, this Court should reject Coughlin's view, and affirm that these are serious crimes that are worthy of prosecution.  Coughlin's sentence and fine should reflect the seriousness of his offense, promote respect for the law, provide just punishment, and deter future criminal conduct.

## II.   Coughlin's Offense Conduct.

### A.   The Charges to which Coughlin Pled Guilty.

On April 22, 2008, Coughlin pled guilty to a felony conflict of interest in violation of 18 U.S.C. §§ 208 and 216(a)(2).  Ex. 1.  Coughlin acknowledged that he willfully participated personally and substantially as a government official in particular matters in which Ring, Greenberg Traurig ("GT"), and he himself had a financial interest.  Ex. 2 at 3.  He had two such conflicts: he accepted gratuities from Ring, and he discussed prospective employment with Ring, all while helping Ring's lobbying efforts.  Ex. 2 at 3.

Coughlin's assistance to Ring is detailed on pages 3 through 7 of the statement of offense.  While Coughlin was taking these actions on Ring's behalf, Ring paid for Coughlin's meals and drinks on about 25 occasions; Ring gave him about 20 tickets to seven sporting events; Ring gave him about five tickets to about three concerts; Coughlin solicited, but did not obtain, tickets to two other concerts; and Ring paid for one round of golf for Coughlin.  Ex. 2 at 8.

Importantly, Coughlin admitted that he "personally received these things of value from

[Ring] otherwise than as provided by law for the proper discharge of official duty, for or because of official acts performed or to be performed by Coughlin in his capacity as a DOJ liaison."   Ex. 2 at 9.  That is, Coughlin acknowledged that the things of value Ring gave him met the definition of illegal gratuities under 18 U.S.C. § 201(c).  Coughlin knew that Ring was not paying for these gratuities personally, but was expensing them.  Ex. 2 at 2.

Coughlin's second conflict arose because, while he was assisting Ring's lobbying efforts with DOJ, he was also discussing with Ring the prospect of working with Ring as a lobbyist.  Ex. 2 at 10.  Coughlin had two such discussions with Ring, in March and April 2002.  Ex. 2 at 10; Ex. 8 (e-mail) (Coughlin states that he is "supposed to discuss further [with Ring] the prospect of going over to his shop.").  E-mails reflect that Abramoff agreed to try to hire Coughlin, Ex. 9, and that Coughlin told a friend he was "making some big job related decisions," Ex. 10.  However, Coughlin stated that he did not take the GT job because it "was just taking too long and they anticipated it would be a couple of months before they could make an official offer." Ex. 11 (e-mail).

### B.    Coughlin's Other Criminal Conduct.

As detailed in pleadings in the case of United States v. Ring, 08-ESH-274, Coughlin conspired with Ring to deprive the DOJ of Coughlin's honest services and to accept gratuities from Ring.  See, e.g., Ex. 3 at 6-10; Ex. 12 at 7-11 (Government's Supplemental Opposition to Defendant's Motion to Strike Exhibits, United States v. Ring, no. 08-ESH-274, doc. 98).  Coughlin also filed false financial disclosure forms on which he did not disclose the gratuities he was receiving from Ring.  Ex. 2 at 8.

In exchange for Coughlin's cooperation plea to the felony conflict of interest, the

government agreed not to bring additional charges against him, Ex. 1 at 1-2, although the

government reserved its full right of allocution to this Court regarding the factors to be

considered when fashioning a sentence, Ex. 1 at 4.

**III.    Coughlin's Cooperation Was of Limited Value to the Government.**

Coughlin's cooperation consisted of providing information, testifying in one proceeding,

and be willing to testify at trial, although he was not called.

Coughlin was interviewed by DOJ Office of the Inspector General agents regarding other

DOJ officials.  He was also interviewed by an FBI agent regarding the broader Abramoff

investigation.  And he was interviewed by a DOJ OIG agent regarding allegations of politicized

hiring at DOJ.  In total, Coughlin was interviewed about eight times.  The bulk of these

interviews required him to travel to Washington, DC, and to stay overnight.  These interviews

were of some use in closing the OIG's investigations of two DOJ officials, and in completing the

investigation of allegations of politicized hiring at the DOJ.

Coughlin also testified in one proceeding.  Coughlin at all times indicated that he was

willing to testify at the trial of Kevin Ring as well.  Coughlin's cooperation was of minimal

assistance in the Ring case, however, for two reasons: he failed to recall the key details of his

official assistance to Ring or the matters about which Ring lobbied him; and he minimized his

own wrongdoing.

**A.    Coughlin's Failure of Recollection.**

In his interviews, Coughlin maintained that he recalled little about his key interactions

with Ring.  For example, he did not recall strategizing with Ring regarding how to overturn the

DOJ's Choctaw jail grant decision, although he acknowledged writing various e-mails on the

7

subject.  <u>E.g.</u>, Ex. 13 (e-mail).  He did not recall what prompted Ring to write to his fellow

lobbyists – shortly before a meeting with the Attorney General's Chief of Staff, David Ayres,

regarding the Choctaw jail grant – that "Bob [C]oughlin . . . [j]ust told me that he think[s]

[A]yres will get the joke."  Ex. 14 (e-mail).  Coughlin claimed to have no knowledge how the

Choctaw jail grant was awarded or what if any role Ayres played in the decision – despite

Coughlin's email to Ring stating that there would be no strings on the grant award because it was

"a directive from the AG's office," Ex. 15, his e-mail in which he wrote that the "5th floor

[A.G.'s floor] wants this [the jail grant] moved," Ex 16, and other similar e-mails.  Coughlin

further claimed not to recall what he said to an INS employee in a telephone conversation

regarding his request that INS expedite the inspection of Abramoff's school.

Despite his stated lack of any significant recollection of the transactions at issue, the

government planned to call Coughlin to testify at the trial of Kevin Ring in D.C. District Court.

He could have provided useful context to the incriminating e-mails.  Moreover, the government

believed that the jury would want to see and hear from him.

**B.      Coughlin's Minimization of His Criminal Culpability.**

On September 1, 2009, the government prepared Coughlin for his direct examination.  At

the outset, the government informed him that whether he received a 5K departure for cooperation

or not was not dependant upon whether Ring was convicted.  The government said something to

the effect of: "you have already earned your 5K [by meeting with us and testifying in another

proceeding] – all you have to do now is testify truthfully at trial, just as you've already done."

The next day, however, in a second pretrial preparation session, Coughlin made a series

of self-serving statements that minimized his culpability and were arguably inconsistent with his

prior acknowledgment of guilt before this Court during his guilty plea.

> In the course of those conversations, Mr. Coughlin, though admitting that he committed the elements of the conflict-of-interest charge to which he pleaded guilty, broadly denied having the intent to commit any federal felony. Mr. Coughlin believes that the government unfairly singled him out for prosecution. He opined that the decision to charge with a felony was an abuse of prosecutorial discretion.

> Mr. Coughlin also believes that Faith Burton, a DOJ ethics officer, told him that his receipt of tickets from Kevin A. Ring was not a violation of the DOJ's ethics rules.   At the time of his actions, Mr. Coughlin did not believe that he acted other than in the government's best interests.  The things of value Mr. Ring gave him did not influence Mr. Coughlin's official actions.  At the time of his actions, Mr. Coughlin did not believe he was treating Mr. Ring preferentially. Mr. Coughlin did not conspire with Mr. Ring to commit a crime and does not know or barely knows several of the other alleged coconspirators.

> Mr. Coughlin does not believe that his friendship with Mr. Ring changed when Mr. Coughlin began working at the U.S. Attorney's Office for the Eastern District of Virginia. If the two spent less time together, it was because Mr. Coughlin no longer worked in downtown Washington and was busier, and because of Mr. Ring's family responsibilities.

> Though he admitted discussing with Mr. Ring the prospect of working at Greenberg Traurig LLP (GT), Mr. Coughlin was never interviewed by GT, has never been to GT, and did not send his resume to or discuss a starting salary with anyone at GT.  Mr. Coughlin viewed his work for Mr. Ring on the Eshkol Academy as unimportant and not notable.

Ex. 6.[1]

As described at the outset of this memorandum, Coughlin's self-serving claims appear to

contradict both the e-mail evidence and Coughlin's own prior acknowledgments of guilt.  See

---

[1]  The government read the statements in the September 9, 2009, letter to Coughlin's counsel before sending the letter, to ensure that his counsel agreed that the letter accurately reflected Coughlin's statements.

Section I, supra; see also, e.g., Ex. 3 at 6-10; Ex. 12 at 7-11.[2]  Coughlin's statements also minimize the seriousness of his discussions about working as a lobbyist with Ring while he was assisting Ring's lobbying efforts as a DOJ official.  See Section II.A., supra.  Because Coughlin's statements that appeared to contradict the record evidence in this case, the government did not believe it was appropriate to call him as a witness.

**IV.     The Guidelines Calculation, including the Government's 5K1.1 Motion, Yields an Offense Level of Eight and a Criminal History Category of I.**

For the most part, the parties agree as to the appropriate Guidelines calculation in this case.  There is one material disagreement: whether the two Redskins suite tickets that Coughlin received in October 2001 should be valued at their cost to Abramoff and GT, which is about $874 ($437 apiece), or at a value closer to the price printed on the tickets, $77.25 apiece.

As a preliminary matter, the parties agree that the 2002 Guidelines Manual applies to his offense.  Ex. 1 at 2.  The guideline provision applicable to the defendant's conflict of interest is section 2C1.3.  The base offense level is six.  See USSG §2C1.3(a).  Because the offense involved gratuities, the offense level from section 2C1.2 is to be applied if it is greater than six. See USSG §2C1.3(c)(1); Ex. 1 at 2.

The base offense level from USSG section 2C1.2(a) is seven.  The parties agree that

---

[2]  Moreover, Coughlin's statement that "if" his relationship with Ring changed when he left DOJ, "it was because" of Ring's family responsibilities and because Coughlin was no longer in DC, contradicts Coughlin's statement of facts, in which he admitted that "When Coughlin left his position at OIPL in or about November 2003 to go on a detail to EDVA, and was no longer able to assist Lobbyist A's [Ring's] efforts, [Ring] abruptly curtailed buying him meals, drinks and tickets – only to reconnect as soon as the detail ended and Coughlin returned to Main Justice."  Ex. 2 at 8.  Indeed, much of Coughlin's detail as a prosecutor was spent at the D.C. U.S. Attorney's office in downtown Washington, but Coughlin and Ring never corresponded during that approximately six-month time period.

because the offense involved more than one gratuity, the offense level is to be increased by two levels (to nine) pursuant to section 2C1.2(b)(1).  Ex. 1 at 2.

The parties agreed as to the list of things of value that constitute the gratuities in this case, as listed below.  The parties disagree, however, about the value of these gratuities, and therefore they disagree about the extent to which the offense level is to be increased pursuant to USSG section 2C1.2(b)(2).

**A.    The Offense Level Should Be Increased to 11 Because the Value of the Gratuities Exceeds $5,000.**

The government calculates the value of the gratuities that Coughlin received as about $6,180.  Ex. 2 at 8.  Because this is greater than $5,000, the offense level should be increased by two levels (to eleven).  See USSG §2C1.2(b)(2)(A)(ii) & §2B1.1(b)(1)(B).  By contrast, the defendant calculates the value of the gratuities as less than $5,000, to wit, about $4,800.  Ex. 2 at 8.  If that were correct, the offense level would be increased by only one level (to ten).  See USSG §2C1.2(b)(2)(A)(i).

These calculations are the result of different estimates for the value of certain of the gratuities, as set forth in the chart below.  However, this Court need only resolve the value of a single gratuity in order to resolve the parties' dispute – the October 2001 Redskins suite tickets.

**Estimated Values of the Gratuities Received by Coughlin**[3]

| Date | Item | Government's estimate | Coughlin's estimate |
|------|------|----------------------|---------------------|
| 3/23/2001 | Dinnner at the Dubliner | $12.34 | $15.42 |
| 3/29/2001 | Dinner at Lebanese Taverna | $106.56 | $71.04 |
| 4/19/2001 | Dinner at Olives | $100.17 | $150.24 |

---

[3]  The values labeled "Coughlin's estimate" were provided to the government by Coughlin's counsel during the course of the plea negotiations.

| 5/2/2001 | Dinner at DC Coast | $60.71 | $60.71 |
|---|---|---|---|
| 8/24/2001 | PB Dye round of golf | $142.77 | $149.10 |
| 8/24/2001 | PB Dye golf - refreshments | $6.41 | $0.00 |
| 8/27/2001 | Dinner at Capital Grille | $237.34 | $171.16 |
| 10/20/2001 | Café Japone (dinner / drinks) | $66.90 | $66.90 |
| 10/21/2001 | Two tickets to Redskins vs. Carolina, Suite 363 | $874.57 | $198 |
| 10/21/2001 | Additional catering at FedEx Field | $4.88 | $0 |
| 11/2/2001 | Lunch At Oceannaire | $57.17 | $57.16 |
| 12/3/2001 | Dinner at Caucus Room | $150.06 | $75.00 |
| 1/4/2002 | One ticket to Wizards v. Chicago, second row (BBB) | $249.00 | $165.00 |
| 1/4/2002 | The Rock before and after Wizards game | $50.00 | $50.00 |
| 1/20/2002 | Elton John & Billy Joel Concert | $176.00 | $176.00 |
| 1/26/2002 | Four tickets to Wizards vs. Suns, in the suite | $478.08 | $300 |
| 1/26/2002 | Drinks at Dubliner Restaurant before game | $75.00 | $75.00 |
| 3/8/2002 | Crosby, Stills, Nash & Young Concert | $89.00 | $89.00 |
| 3/8/2002 | Refreshments at CSNY Concert | $32.19 | $0.00 |
| 3/20/2002 | Lunch at Signatures | $37.90 | $37.90 |
| 4/4/2002 | Dave Matthews Band Concert | $93.00 | $93.00 |
| 4/4/2002 | Signatures - Before Concert | $69.80 | $20.00 |
| 4/11/2002 | Dinner at Signatures | $78.45 | $78.45 |
| 5/30/2002 | Drinks at Signatures | $50.00 | $20.00 |
| 6/6/2002 | Drinks at Signatures | $20.00 | $20.00 |
| 6/28/2002 | Lunch at Signatures | $24.42 | $24.42 |
| 10/23/2002 | Lunch at Capital Grille | $48.54 | $48.54 |
| 11/13/2002 | Four tickets to Capitals vs. Dallas, in the suite | $474.00 | $316.00 |

| 12/10/2002 | One ticket to Wizards vs. Portland | $80.00 | $80.00 |
|---|---|---|---|
| 12/18/2002 | Lunch at Signatures | $25.86 | $25.86 |
| 1/9/2003 | Drinks at Signatures | $50.00 | $50.00 |
| 2/13/2003 | Drinks at Signatures | $100.00 | $50.00 |
| 3/9/2003 | Bon Jovi tickets, requested but not received | $0.00 | $0.00 |
| 3/15/2003 | Four tickets to Wizards vs. Miami, third row (CCC) | $860.00 | $860.00 |
| 3/18/2003 | Four tickets to Wizards vs. Detroit, third row (CCC) | $860.00 | $860.00 |
| 5/19/2003 | Dinner at Signatures | $210.07 | $210.00 |
| 6/17/2003 | Drinks at Signatures | $20.00 | $20.00 |
| 8/18/2003 | Lunch at Charlie Palmer Steak House | $44.91 | $44.91 |
| 9/29/2003 | Fleetwood Mac tickets, requested but then declined | $0.00 | $0.00 |
| 10/15/2003 | Lunch at Capital Grille | $30.43 | $30.33 |
| 10/23/2003 | Lunch at Signatures | $32.28 | $32.28 |
| | **TOTAL** | **$6178.81** | **$4791.42** |

The parties agree that the only material dispute for this court to resolve is the value of the two tickets that Coughlin received to Suite 363 at FedEx field, to watch the Redskins on October 21, 2001. If the two October 2001 Redskins suite tickets are valued at the $437 per-ticket cost to Abramoff (or even at the lower $340 per ticket value using the Office of Government Ethics' estimate), then the total value of the gratuity is above $5,000 even accepting Coughlin's other estimates. On the other hand, if the two October 2001 Redskins suite tickets are valued at the defendant's value of $99 each (or at the lower printed $77.25 "face value") then the government agrees that the total value of the gratuities would be less than $5,000 but greater than $2,000.

The two Redskins tickets Coughlin received should be valued at $437 each, totaling

$874.  Coughlin received two suite tickets to Suite 363 at FedEx Field to see the Redskins play the Carolina Panthers on October 21, 2001.  Ex. 17 (e-mails).  The lease of Suite 363 cost Abramoff and GT $61,219.80 for the 2001 NFL season.  Ex. 18 (Redskins chart) at 1.  That suite contained 14 seats, Ex. 18 at 1, and the lease entitled the holder to watch eight home and two preseason games – therefore the lease of the suite constituted 140 tickets.  Dividing $61,219.80 by 140 equals $437.28 for each ticket.  Multiplying by two (because Coughlin received two tickets) yields a value of $874.57.

The government would also accept the valuation method prescribed by the Office of Government Ethics, which is the Executive Branch entity with the authority to promulgate and interpret Executive Branch ethics rules.  "The Office of Government Ethics consistently has advised that a gift of attendance in a skybox or private suite is determined by adding the market value of the most expensive publicly available ticket to the event to the market value of the food, parking and other tangible benefits provided in connection with the gift of attendance."  Ex. 19 (OGE opinion) at 3 (emphasis added).  In this case, the most expensive publicly available ticket to the October 21, 2001 Redskins game was $340 per ticket.  Ex. 20 (Redskins letter) at 2.  The two tickets would therefore be worth $680.

Even assuming all of Coughlin's other values were correct, if the two October 2001 Redskins tickets were valued at either $874.57 or $680, the total value of the gratuities would exceed $5,000.

By contrast, the defendant estimated the value of these suite tickets as $99 apiece, totaling $198.  The government is not aware of the basis for this estimate.

The suite tickets bore a "face value" of $77.25.  Ex. 20 at 2.  This printed figure is not an

14

appropriate measure of the value of the ticket, however because it bore no relationship to the actual value of the ticket. The Redskins "did not separately sell individual tickets for Suites," at any price. Ex. 20 at 2. In fact, even the far-more-expensive tickets to Abramoff's Owner's Club Suite, which cost $293,648.90 for 27 seats for the 2001 season (or $1087.59 per seat), Ex. 18 at 1, bore the same arbitrary $77.25 "face value," Ex. 20 at 2.

For this reason, the Office of Government Ethics has prohibited executive branch employees from relying upon the printed "face value":

> We understand that some venues may prepare skybox or private suite tickets that include a purported "face value." <u>An employee may not rely on the price stated as the correct fair market value if the tickets to attend the event in the skybox or private suite are not available for purchase by the general public at that "face value" amount.</u> Rather, the employee must determine the fair market value of the total gift of free attendance by adding the value of all tangible benefits received with the admission [food, drinks and parking] to the value of the highest priced publicly available ticket to the event.

Ex. 20 at 5 (emphasis added).[4]

For these reasons, the two October 2001 Redskins suite tickets should be valued at $874, and the total value of the gratuities should be found to be greater than $5,000, increasing the offense level to 11.

### B.  The Resulting Offense Level Should Be Reduced by Two Levels to Nine, Due to the Defendant's Acceptance of Responsibility.

The government has concerns about the degree to which the defendant has accepted responsibility for his criminal conduct, as described in section I and II.B. above. Although he

---

[4] This Office of Government Ethics opinion letter was issued on February 9, 2007, and thus was not in existence when Coughlin received his tickets in 2001. However, the approach to valuing suite tickets therein had been promulgated by the OGE as early as 1993, in one of the initial training sessions for agency ethics officials. Ex 21 (e-mail). The Director of the DOJ Ethics Office, Janice Rodgers, attended that training session. Ex 21.

pled guilty, truthfully allocuted before this court and truthfully testified in one proceeding, he subsequently made statements that appear inconsistent with acceptance of responsibility.  Ex. 6, PSR at 11.  Weighing these statements, the government believes that the defendant should still receive a two-level downward departure for acceptance, but that his statements and actions that are inconsistent with acceptance of responsibility should inform the Court's decision 1) where within the Guidelines range to sentence the defendant and 2) how to weigh the sentencing factors under 18 U.S.C. § 3553(a).

The defendant's plea agreement provided: "Assuming [Coughlin] clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through [his] allocution and subsequent conduct prior to the imposition of sentence, the Government agrees that a two-level reduction would be appropriate, pursuant to § 3E1.1(a)."  Ex. 1 at 3.  USSG §3E1.1(a) (2002) provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels."  The application notes state that in determining whether a defendant qualifies for this reduction, appropriate considerations include, but are not limited to, the following:

> (a)　　truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct.)  . . . [A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.
>
> . . .
>
> (f)　　voluntary resignation from the office or position held during the commission of the offense . . . .

USSG §3E1.1, App. note 1 (2002) .

In this case, the defendant truthfully admitted the offense conduct in his sworn statement

of the offense.  Ex. 2.  On April 22, 2008, Coughlin admitted under oath before this Court that the factual basis was true and correct.  Ex. 22 (Rule 11 colloquy) at 6-8.  Moreover, "Coughlin has told the government that in hindsight, it is clear to him that Ring gave him many of the things of value as illegal gratuities, an object of the Count I conspiracy [charged against Ring].  Coughlin also has acknowledged that in hindsight, Ring corrupted him."  Ex. 3 at 2.  Coughlin also demonstrated a degree of acceptance of responsibility when he met with government counsel on about eight occasions after his plea and provided some additional information relating to his offenses.  At no time did Coughlin deny any of the facts proving the conflict of interest offense to which he pled guilty – those facts being established by contemporaneous e-mails.  Finally, another factor favoring acceptance is the fact that Coughlin resigned from his position at the DOJ shortly after being interviewed as part of this investigation.

However, the government is concerned that Coughlin's minimization of his offense conduct, and his insistence that he should not have been prosecuted for a felony at all, demonstrate that he has not fully accepted responsibility for his crimes.  See Sections I & II.B, supra.  The Guidelines provide that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."  USSG §3E1.1, App. note 1 (2002).  In United States v. Ring, this Court found by a preponderance of the evidence that Coughlin and Ring were coconspirators, and therefore admitted Coughlin's statements as nonhearsay.  Coughlin's minimization of this criminal conduct cuts against a finding that he accepts responsibility.

Weighing all of these facts, the government concludes that Coughlin warrants the two-level reduction in offense level for his acceptance of responsibility.  However, the government

believes that his recent statements should be taken into consideration when choosing where to sentence him within the Guidelines range, and when weighing the sentencing factors under 18 U.S.C. § 3553(a).

### C.     The Government Moves for a One-Level Downward Departure under USSG §5K1.1.

The government moves for an additional one-level downward departure in recognition of the nature and extent of Coughlin's cooperation, described in Section III above.

The plea agreement provided that "[a]t the time of [Coughlin's] sentencing, the Government will advise the Sentencing Judge and the United States Probation Office in the District of Columbia of the full nature, extent, and value of the cooperation provided by [Coughlin] to the Government.  If the Government determines that [Coughlin] has provided substantial assistance in the investigation or prosecution of another person or entity that has committed any offense, then the Government will file a motion pursuant to § 5K1.1."  Ex. 1 at 5. This pleading constitutes that motion.

As stated in section III above, the defendant's cooperation was of assistance in closing two other DOJ OIG investigations.  His cooperation was also of assistance in the investigation of politicized hiring at the DOJ.

As further explained in section III above, the defendant's cooperation was of minimal assistance in the prosecution of Kevin Ring.  In fact, Coughlin's minimization and less-than-forthright acknowledgment of his wrongdoing, during trial preparation, caused the government to scramble on the eve of trial to find other witnesses who could fully and accurately describe Ring's efforts to corruptly influence and reward DOJ officials.

Thus, the government believes that Coughlin's cooperation warrants no more than a single-level downward departure. This United States Attorney's Office routinely recommends a single-level downward departure to cooperators whose cooperation is limited to providing information, as Coughlin's was.

**V.   Coughlin's Sentence and Fine Should Recognize the Seriousness of this Offense, Promote Respect for the Law, Provide Just Punishment and Afford Adequate Deterrence in the Future.**

If Coughlin receives a single-level downward departure under §5K, his final offense level would be an eight. With criminal history category I, his advisory sentencing range would be between 0 and six months' imprisonment and within Zone A. His sentence within that range should be fashioned so as to recognize the seriousness of this offense, promote respect for the law, provide just punishment and afford adequate deterrence in the future.

The Sentencing Guidelines range is but one factor that a court is to consider in imposing a sentence. Under 18 U.S.C. § 3553(a), a sentencing court is to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a)(2). These purposes include, as relevant to this case, "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B). In addition, in determining its sentence, a court is to consider the following factors:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)   the need for the sentence imposed —
> > (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B)   to afford adequate deterrence to criminal conduct;
> > (C)   to protect the public from further crimes of the defendant;

and
    (D)    to provide the defendant with needed educational or
                vocational training, medical care, or other correctional
                treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the [guidelines] sentencing range . . .

    (5)    any pertinent policy statement . . . issued by the Sentencing
                Commission . . .

    (6)    the need to avoid unwarranted sentence disparities among
                defendants with similar records who have been found guilty of
                similar conduct; and

    (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

**A.      The Nature and Circumstances of the Offense.**

Coughlin's offense was not a mere one-time conflict of interest.  His crime took place over two and a half years and involved the receipt of a stream of dozens of illegal gratuities, as well as repeated false financial disclosures.  The crime involved the corruption of the Department of Justice itself.  Coughlin allowed favoritism and greed to displace the trust placed in him as a government official.

**B.      The History and Characteristics of the Defendant.**

Coughlin had every advantage that should have kept him on the straight and narrow path. As a DOJ employee, he worked every day with public servants whose duty was to enforce the criminal laws, and yet he was violating those laws.  He was an attorney, and thus knew that ignorance of the law would be no excuse for its violation.  His disclosure of confidential DOJ information and his preferential treatment toward his lobbyist friend, described above, violated his ethical duties to DOJ.  5 C.F.R. § 2635.101.  Moreover, as an attorney he should have understood the need for confidentiality and loyalty to his employer.

As described in section I.D above, the government finds incredible Coughlin's claim that his ethics adviser told him he could accept – and even solicit – all of these gifts from a friend who was lobbying him.  As a DOJ employee, Coughlin was given mandatory annual ethics training, at which the rules against gifts from prohibited sources were a primary topic of discussion.  These rules made clear that there were <u>no</u> exceptions permitting an employee to <u>solicit</u> a gift from a prohibited source like a lobbyist lobbying DOJ.  See 5 C.F.R. § 2635.202(c)(2).  Even had there been no training, Coughlin should have known and followed the ethical rules that applied to him.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence.

It is critically important that the sentence imposed in this case reflect the seriousness of the offense – particularly because the defendant maintains that his criminal conduct should not have been prosecuted.  Ex. 6 at 1.  The defendant's attitude cannot be abided if we wish to demonstrate a commitment to honest government – free of conflicts of interest, payment of gratuities, and other corruption.  In order to promote respect for the law and to provide just punishment, government officials should understand that the laws against conflicts of interest, the laws against gratuities, the truthfulness of annual financial disclosure forms, and the ethical rules in the Code of Federal Regulations are <u>important</u>.  In order to afford adequate deterrence, violations like this – taking place over years and involving repeated violations of the duties of trust and responsibilities to the Department of Justice – should be prosecuted and punished.

Respectfully submitted,

Stuart M. Goldberg,
Acting United States Attorney


_____/s/_____

By:    Michael J. Leotta,
Appellate Chief
D.C. Bar no.  463018

Special Attorneys to the Attorney General

United States Attorney's Office
District of Maryland
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

November 18, 2009

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2009, I caused a copy of the foregoing pleading to

be served by electronic delivery upon Joshua Berman, Esq., counsel for Robert Coughlin.


_____/s/_____
Michael J. Leotta