UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal No. 08-cr-111-ESH |
| ROBERT E. COUGHLIN, II | : | |
| _____ | : | |

**DEFENDANT ROBERT COUGHLIN'S MEMORANDUM IN AID OF SENTENCING**

Joshua G. Berman (D.C. Bar # 489751)
Sonnenschein Nath & Rosenthal LLP
1301 K St N.W. Suite 600E
Washington, D.C. 20005
Telephone: (202) 408-5208
Facsimile:  (202) 408-6399

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

PRELIMINARY STATEMENT .............................................................................. 1

I.  MR. COUGHLIN'S BACKGROUND ................................................... 2

    A.  Personal and Educational Background ....................................... 2

    B.  Mr. Coughlin's Character: His Commitment to Family and Friends ......... 6

    C.  Mr. Coughlin's Charitable and Community Service ................................ 15

    D.  Mr. Coughlin's Professional Career and Close Friendship with  Kevin Ring ................................................................................................. 18

        1.  1999-2001: Mr. Coughlin's Years at the Senate ........................... 18

        2.  Mr. Coughlin's Close Friendship with Kevin Ring ...................... 19

        3.  Mr. Coughlin's Work at the Department of Justice and the Offense Conduct. ...................................................................... 22

    E.  Mr. Coughlin's Life After the Department of Justice .............................. 29

II.  A SENTENCE OF NO JAIL TIME IS APPROPRIATE IN THIS CASE ........... 30

    A.  Legal Framework for Sentencing Analysis under *Booker* and *Gall* ......... 30

    B.  Consideration of All § 3553(a) Factors Supports a Sentence   of No Jail Time ................................................................................................. 31

        1.  Mr. Coughlin's Advisory Guidelines Range ................................ 31

            A.  The Loss Amount Should be Calculated at Less than $5,000 ................................................................................ 34

        2.  The History and Characteristics of Mr. Coughlin Support A Departure Below the Guidelines Range ........................................ 40

        3.  The Nature and Circumstances of the Offense Support A Departure Below the Guidelines Range ........................................ 42

        4.  There Is No risk of Recidivism, Thus Supporting a Non-Jail Sentence ...................................................................................... 45

i

5. A sentence of incarceration will destroy his family...................... 47

C. Mr. Coughlin Provided Substantial Assistance In the Investigation and Prosecution of Others and Warrants a Reduction Pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553 ................................................................. 522

1. Mr. Coughlin's Absolute Candor and Honesty with the Government In No Way Undermines His Acceptance of Responsibility or His Cooperation................................................ 54

D. The Appropriate Sentence for Mr. Coughlin Is "Time Served" with No Term of Incarceration .............................................................................. 62

Conclusion ...................................................................................................................... 63

# TABLE OF AUTHORITIES

## CASES

Gall v. United States, 128 S.Ct. 586 (2007)...................................................................... 30, 31, 32

Kimbrough v. United States, 128 S.Ct. 558 (2007) ............................................................ 30, 31

United States v. Booker, 543 U.S. 220 (2005)..................................................................... 30, 31

United States v. Dyce, 91 F.3d 1462 (D.C.Cir. 1996) ...................................................... 50

United States v. Galante,111 F.3d 1029 (2d Cir. 1997)...................................................... 50

United States v. Gauvin, 173 F.3d 798 (10th Cir. 1999) ................................................... 50

United States v. Greene, 249 F. Supp. 2d 262 (S.D.N.Y. 2003)........................................ 50

United States v. Sclamo, 993 F.2d 970 (1st Cir. 1993) ...................................................... 50

Valdes v. United States, 437 F.3d 1276  (D.C. Cir. 2006) ............................................... 32

## STATUTES, RULES AND REGULATIONS

18 U.S.C. § 208............................................................................................................ 32, 55, 56

18 U.S.C. § 3553........................................................................................................... 31, 51, 61

18 U.S.C. § 3553(a) .................................................................................................. 2, 30, 31, 32

18 U.S.C. § 3553(a)(2)..................................................................................................... 31

18 U.S.C. § 3553(a)(5)..................................................................................................... 31

18 U.S.C. § 3553(a)(6)..................................................................................................... 31

I.R.C. § 274(l)(2) ............................................................................................................ 36

I.R.C. § 274(n)(1)............................................................................................................ 36

Treas. Reg. § 1.13206(e)(1) ........................................................................................... 37

Treas. Reg. § 1.61-21(b)(2)............................................................................................ 36

U.S.S.G. § 2C1.2(b)(1) .................................................................................................. 32

i

U.S.S.G. § 2C1.2(b)(2)(A)(i) ........................................................................................ 32

U.S.S.G. § 2C1.2(b)(2)(A)(ii) ....................................................................................... 32

U.S.S.G. § 2C1.3(c)(1)................................................................................................... 32

U.S.S.G. § 2C1.2 ........................................................................................................... 36

U.S.S.G. § 2C1.2(b)(2) .................................................................................................. 34

U.S.S.G. § 3E1.1(a) ................................................................................................. 32, 33

U.S.S.G. § 5H1.6 ........................................................................................................... 50

U.S.S.G. § 5K1.1 ..................................................................................................... 51, 61

U.S.S.G. § 2B1.1(b)(1)(B) ............................................................................................ 40

U.S.S.G. § 2C1.2(b)(2)(A) ............................................................................................

U.S.S.G. §2B1.1 ............................................................................................................ 36

U.S.S.G. §2C1.3(a) ........................................................................................................ 32

## MISCELLANEOUS

153 Cong. Rec. H13564, 13580 (daily ed., Nov. 13, 2007) ........................................ 46

H.R. Rep. No. 110-140, pt II (2007)............................................................................. 46

The Second Chance Act of 2007, Pub. L. No. 110-199, 122 Stat. 657 (2008)............................ 46

Ellen S. Podger, Throwing Away The Key, 116 Yale L. J. Pocket Part 279 (2007).................... 45

John S. Martin, Jr., Let Judges Do Their Job, N.Y. Times, at A31 (June 24, 2003) (2003 WLNR
   5657759) ................................................................................................................... 47

Peter J. Henning, Prior Good Works in the Age of Reasonableness, 20 Fed Sent'g Rep.
   87 (2008)................................................................................................................... 45

Senate Ethics Manual (2009) ...................................................................................... 39

The Future of Children, Volume 15, No. 2, September 2005 ...................................... 47

U.S.S.C., Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing
   Guidelines, at 6 (2004)..............................................................................................46

25312648

## INTRODUCTION

Robert Coughlin, by his undersigned counsel, submits this Memorandum to assist the Court in determining an appropriate sentence with respect to Mr. Coughlin's conviction by a guilty plea to Count One of the Information, pursuant to a written cooperation plea agreement. For the reasons set forth below, we respectfully submit that the appropriate sentence in this case is a non-incarceration sentence, due to the nature and circumstances of the underlying conduct, his lifetime of good works, his providing substantial assistance in the investigation and prosecution of others, his full cooperation, and his unequivocal acceptance of responsibility. Specifically, this Memorandum provides information about Mr. Coughlin's personal background and character, the criminal conduct, and his cooperation with law enforcement agents and prosecutors in their efforts to unravel parts of the Abramoff web.

## PRELIMINARY STATEMENT

Robert Coughlin has lived a life of public service, charitable giving, compassion and integrity. His life exemplifies true family values and good deeds. He is a wonderful father to his 5-month old daughter Grace. He is a devoted husband to the love of his life Katherine. By all accounts, he is a wonderful son, brother and friend. He has earned the respect and admiration of his family, friends and colleagues. He has served our government admirably in a number of positions.

As the Court determines an appropriate sentence, we ask that the Court consider a variety of factors, including but not limited to Mr. Coughlin's commitment to public and community service, his cooperation with the government and his full acceptance of responsibility for acts he committed over eight years ago. Mr. Coughlin is a first-time offender, convicted upon a guilty plea of a single count violation of the conflicts of interest rules, pursuant to a plea and cooperation agreement. Mr. Coughlin stands before the Court, accepting responsibility for his

1

conduct, and full of shame and remorse for what he has done.  Mr. Coughlin respectfully

requests that the Court take note of his otherwise exemplary personal, family, community

service, and professional background.  Numerous letters from family, friends and colleagues

clearly demonstrate the many wonderful qualities of Mr. Coughlin and the critical role he plays

in his family, among his close friends, and in his community.  These letters tell of Mr.

Coughlin's life of good deeds and absolute devotion and unwavering commitment to family,

friends, and community, apart from his errors in this case.  Mr. Coughlin also respectfully

requests that the Court consider the very specific circumstances of his conduct, described below.

Mr. Coughlin also respectfully requests that the Court consider, in mitigation, his extraordinary

work in providing substantial assistance to the government in a variety of ways.  These efforts,

described below, confirm Mr. Coughlin's commitment to making amends and staying on the

right side of the law.

       For these reasons, and others discussed below, Mr. Coughlin respectfully requests that

the Court impose a non-incarceratory sentence.  Such a sentence is sufficient, but not greater

than necessary, to comply with Title 18, United States Code, Section 3553(a).

   **I.**     **Mr. Coughlin's Background**

        **A.**     **Personal and Educational Background**

       Mr. Coughlin was raised in a middle class Midwestern family.  Above all else, his parents

stressed compassion, integrity, education and public service to Mr. Coughlin and his older sister

Chrissy.  Mr. Coughlin was raised in a home where his family not only "talked the talk" in terms

of community and public service but also "walked the walk."   As described in detail in Section

I.C. below, community and charitable service were daily parts of Mr. Coughlin's life.  Likewise,

commitment to public and government service were part of Mr. Coughlin's core.  His

grandfather – who also in many ways was and remains his idol – was the Attorney General of the

State of New Hampshire, a  United States Congressman and a Superior Court Justice.  Mr. Coughlin throughout his life has sought to follow in his grandfather's footsteps.[1]  Mr. Coughlin's family also always placed a high value on education.  He understood at a young age that the best way for him to give back to the community was through attaining his education and committing himself to public service.

At Pembroke Hill High School in Kansas City, Mr. Coughlin was a stand-out student, receiving top grades.  As described in detail in Section I.C. below, he also was active in charitable, church and community organizations.   Moreover, as set forth in Section I.B. below, he was a terrific friend, always immediately at the side of a friend in need.  Somehow, between his academic successes, his loyalty to friends and his community involvement, he also found time to be one of the city's top athletes in multiple sports.  He won All State Honors in both baseball and soccer, and was elected team-captain in both sports.[2]  In his senior year, he received the coveted Ryan Award for the most outstanding scholar-athlete, a tribute given to the student who not only performed best on the field, but also who excelled in terms of character as well as in the classroom, the community and on the field.[3]

During high school, Mr. Coughlin was involved in a near fatal accident (from which he was not expected to recover) which further affected the kind of person he has become.  Specifically, Mr. Coughlin was thrown from the back of a pick-up truck going 60 miles per hour.  He suffered head and back injuries which resulted in a coma.[4]   He spent over a week in the hospital, suffered multiple head injuries and had a slow and painful physical and psychological

---

[1] Exhibits 3, 4 and 5 (Letters from J. Barry Coughlin, J. Coughlin and C. Coughlin respectively).
[2] Id.
[3] Pre Sentence Investigation Report ("PSR") ¶ 73; see also Exhibits 3, 4 and 5 (Letters from J. Barry Coughlin and J. Coughlin).
[4] PSR ¶ 67; Exhibit 4 (Letter from J. Coughlin).

recovery.[5]  Mr. Coughlin, though, has never used this accident to get pity from others, or as an

excuse to take advantage of life.  Rather, his takeaway from that accident was that he recognized

that he had received the rare and precious gift of a second look at life.   It reaffirmed for Mr.

Coughlin that he needed to make the most out of every moment of life, and that he needed to

give as much of himself as possible to those more needy.  Moreover, Mr. Coughlin knew that

with this second chance, he would always strive to "do the right thing;" at moments later in the

life when he consciously recognized two paths ahead of him, this near tragic experience always

reminded him to make the right choice.

After high school, Mr. Coughlin attended Northwestern University.  As described below

in Section I.C. he continued his civic and charitable efforts.  At Northwestern, Mr. Coughlin was

a Dean's List student, excelling across the academic board.[6]  He graduated with a 3.43 grade

point average.[7]  Unlike most undergraduates, including those who actively participated in

community service and athletic endeavors, Mr. Coughlin graduated with a Bachelors of Arts in

two majors – Political Science and International Studies.  In college, Mr. Coughlin also

continued his athletic pursuits, making the varsity baseball team as a walk-on.[8]  He also played

on and was selected as captain of the Northwestern lacrosse team.[9]  Regardless of the sport or his

role on the team, Mr. Coughlin was known for his leadership and sportsmanship, both on and off

the playing field.[10]

From as early as high school, Mr. Coughlin viewed public service as his life's

professional ambition and knew that getting hands-on public service experience was critical.[11]

---

[5] PSR ¶ 67; Exhibit 4 (Letter from J. Coughlin).
[6] Exhibit 4 (Letter from J. Coughlin).
[7] PSR ¶ 74.
[8] Exhibits 3 and 4 (Letters from J. Barry Coughlin and J. Coughlin).
[9] Id.
[10] Exhibit 6 (Letter from K. Hwang).
[11] Exhibits 3, 4 and 5 (Letters from J. Barry Coughlin, J. Coughlin and C. Coughlin).

25312648

During college, Mr. Coughlin interned in Washington, D.C. on Capitol Hill, getting a first-hand look at federal politics.[12]   It was here -- over 17 years ago -- that he first met and became friends with Kevin Ring.  After college graduation, Mr. Coughlin moved to St. Louis and worked as a low-level campaign staffer on a 1994 Senate campaign.  After the election, Mr. Coughlin moved to Washington, D.C. to serve in the Senate as a legislative aide.  There, he worked on legislative matters pertaining to foreign relations, transportation, water rights and local Missouri constituent concerns.[13]

After nearly two and half years of campaign and legislative work for a U.S. Senator, Mr. Coughlin's next step was no real surprise to friends and family.  Following again in his grandfather's footsteps, Mr. Coughlin attended law school.[14]  He attended the Washington University School of Law in St. Louis.  After law school, he returned to Washington D.C. where he passed the bar.[15]   As described more fully in Section I.D. below, after law school, Mr. Coughlin worked on the Hill and then in 2001 moved to the Department of Justice, where he worked for over six years.  In 2007, Mr. Coughlin voluntarily resigned from DOJ because of the ongoing investigation that gives rise to these proceedings.  In April 2008, Mr. Coughlin pleaded

---

[12] See Exhibit 18 (Statement of the Offense, ¶ 1).

[13] PSR ¶¶ 10, 77.

[14] Exhibits 3, 4 and 5 (Letters from J. Barry Coughlin, J. Coughlin and C. Coughlin).

[15] PSR ¶ 75.  With regard to his bar status, after pleading guilty to violating the conflict of interest statute, Coughlin, through his attorney and by personal affidavit, notified the District of Columbia Court of Appeals Board on Professional Responsibility of his conviction, pursuant to D.C. Bar Rule XI, § 14, and Rule 9.10- of the Rules of the Board on Professional Responsibility. He voluntarily took a suspension from active bar status.  In preliminary proceedings before the Court of Appeals Board on Professional Responsibility, the Board concluded that Coughlin's conduct did *not* rise to the level of moral turpitude *per se*.  The Board recognized the wide range of conduct encompassed by 18 U.S.C. § 208 and when it evaluated the facts in Mr. Coughlin's case, could not conclude that it satisfied the required threshold.  See In the Matter of Robert E. Coughlin, II, 08-BG-585, Bar Docket No. 2008-D178.  The Board is waiting until the conclusion of Coughlin's cooperation with the government and this Court's sentencing determination before reaching its final conclusions with regard to his bar status.

25312648

guilty to a violation of a single count of the conflicts of interest statute.  Since that time, Mr. Coughlin has struggled to find employment.

### B.    Mr. Coughlin's Character: His Commitment to Family and Friends

Mr. Coughlin, in every phase of his life, has been described the same way:  loyal, giving, devoted, generous, unselfish, respectful, compassionate, selfless, trustworthy, concerned for others, considerate, and loving.[16]   Perhaps Mr. Coughlin's friend of 22 years, Dr. Chad Wollard, best summed Mr. Coughlin up when he wrote:  "If I had to describe Bob with one simple phrase it would be that he gives more of himself than he asks of others."[17]

Mr. Coughlin is a man deeply devoted to his parents, his wife, his daughter, his sister and his friends.  It is no surprise then that his sister Chrissy described him as "an amazing human being" with a "deep conscience."[18]   Friends who have observed the way Mr. Coughlin elevates his family have commented:  "I have also seen the importance Bob puts on family through the love, admiration, and respect he has for his mother, father and older sister.  Bob speaks to them several times a week and he ends every conversation with 'I love you.'"[19]   Mr. Coughlin's wife Katherine also described to the Court one her very first interactions with Mr. Coughlin in 2003: "On one of our first dates, he was talking on the phone to his mom and he told her he loved her.

---

[16] Bob Coughlin's friends, family and colleagues have written numerous letters to this Court. Many other individuals reached out to Mr. Coughlin and asked if they too could or should write to this Court.  In an effort to avoid the duplicative nature of these letters, Mr. Coughlin asked a number of friends not to write and unnecessarily burden this Court.  Had Mr. Coughlin encouraged each friend who came forward to write, this Court would have received dozens and dozens more letters.  See Exhibits 1, 3-18 (Letters from K. Coughlin, J. Barry Coughlin, J. Coughlin, C. Coughlin, S. Bloemendal, Lee and Marilyn Bloemendal, R. Thompson, D. LaMothe, C. Wollard, D. Goldner, C. Wisdom, J. Dominguez, K. Hwang,  L. Sharpe Day, K. Wainstein, and A. Fisher).
[17] Exhibit 11 (Letter from C. Wollard).
[18] Exhibit 5 (Letter from C. Coughlin).
[19] Exhibit 10 (Letter from D. LaMothe).

I was sitting right beside him and I remember how surprised I was to hear him speak so lovingly to her right in front of me."[20]

Throughout his life, Mr. Coughlin has always prioritized community and charitable giving, as described in Section I.C. below, and taking care of his friends and family.  While the letters to the Court contain countless anecdotes laying out his devotion to his loved ones, several instances are worth noting here.  In 2004, Mr. Coughlin's sister Chrissy was diagnosed with cancer.  The diagnosis understandably devastated the family, and physically and emotionally overwhelmed Chrissy.  Mr. Coughlin, though, was Chrissy's "pillar of strength" throughout her surgery, eight weeks of radiation therapy, recuperation and long, difficult recovery.[21]  Mr. Coughlin woke up every single morning at 6:00 for two months, drove Chrissy to the Washington Hospital Center, sat with her during radiation therapy and drove her home.  He did so because he did not want her to be alone in this process for even a single moment.  Not surprisingly, Chrissy credits Mr. Coughlin with helping her get through this "horrible and lonely experience," noting very clearly that Mr. Coughlin's "love and support" were critical for her.[22]

Mr. Coughlin's generosity and compassion were directed not only at close family but also at his friends, and in some cases, acquaintances he did not even know that well at the time.  One thing is for certain: Mr. Coughlin always has had a knack for knowing when his friends needed help.  As described above, Mr. Coughlin suffered a near fatal accident in high school which left him in a coma and then a long recuperative period.  When he finally returned home from the hospital, he remained on extended bed-rest, or at least those were the doctor's orders.  While at home, he received a telephone call from a close friend sharing with Mr. Coughlin the tragic news that the friend's father had just committed suicide.  Notwithstanding his own badly bruised and

---

[20] Exhibit 1 (Letter from K. Coughlin).
[21] Exhibit 5 (Letter from C. Coughlin).
[22] Id.

7

still-recovering physical state, Mr. Coughlin struggled out of bed and insisted he help his

mourning friend.   Against his doctor's and mother's orders, Mr. Coughlin spent significant time

consoling his friend to try to help him through the difficult time.[23]

Mr. Coughlin's law school friend Christina Wisdom described in her letter to the Court

how Mr. Coughlin was immeasurably important to her as she struggled through her father's fight

with terminal cancer.   Even though Mr. Coughlin was a relatively new friend at that time, he was

there for her in any and every way she needed.   As she wrote:

> During my second semester of law school, my dad (in Texas) was diagnosed
> with inoperable and terminal cancer and was given about six months to live.
> Like Bob, I come from a very close-knit family, and I was devastated.  Many
> of my friends did not know how to comfort me, but Bob never skipped a beat.
> He stayed with me while I cried.  He was there with me when I wanted to talk
> about cancer and when I wanted to talk about anything but cancer.  He took my
> dogs for walks and took me out to dinner.  He told dumb jokes to make me
> laugh.  In every way he could possibly think of, he supported me on a daily
> basis while I juggled school, work and my dad's illness.[24]

On other occasions, Mr. Coughlin lent a hand in slightly less dramatic – but equally

important – fashion.   In a letter to this Court, Dr. David Goldner, a college friend, described the

"frightening" and intimidating first days of college at Northwestern University, on a large

campus in an unfamiliar city.   Where David did not know anyone, a stranger – Bob Coughlin –

looked out for him.   David identified Mr. Coughlin's "warmth and friendliness" as critical in

"mak[ing] a difficult transition much easier."   David specifically noted that even though Mr.

Coughlin already knew other freshman from his home town, Mr. Coughlin was concerned for

David's well being and went out of his way to include David in their activities.[25]   In a moment in

life -- the first weeks of freshman year of college -- when eighteen year olds focus on little but

---

[23] Exhibit 4 (Letter from J. Coughlin).
[24] Exhibit 13 (Letter from C. Wisdom).
[25] Exhibit 12 (Letter from D. Goldner).

themselves,  Mr. Coughlin's true character again rang through loud and clear -- his concern and care for others.[26]

Likewise, Mr. Coughlin's friend Jennifer Dominguez described a bad moment in her life when she, her husband and their infant son all caught a highly contagious and debilitating stomach virus.  Although Jennifer did not live near any family who could help out, it was Mr. Coughlin who shouldered the role of local family member, showing up at their house unsolicited to bring them medicine, supplies, food and to feed the dog.[27]

Mr. Coughlin also has been known for his sound advice to friends, and his honesty.  As one friend noted, Mr. Coughlin "values honesty and openness above just getting along, and I have benefited from his sound advice most when it was difficult to hear."[28]  Throughout his life – including as early as high school -- Coughlin was recognized for his maturity, judgment and friendship.  While others spent time getting into and out of trouble of varying degrees, Mr. Coughlin was a pillar who helped his friends, no matter the nature of their situation.[29]

Adults, too, have long recognized Mr. Coughlin's exceptional character.  Mr. Coughlin was the only high school sophomore selected for his highly competitive varsity soccer team. As a high school friend noted, Mr. Coughlin was not selected because of his skills, but rather because his coach "saw character and leadership skills he wanted to promote."[30]  Ultimately, the coach

---

[26] Mr. Coughlin's friend Jennifer Dominguez recounted a similar act of kindness.  In an effort to create a community of friends in Washington, D.C., Mr. Coughlin had started a tradition of rotating regular dinners at friends' houses.  Graciously, Mr. Coughlin reached out to Jennifer and her husband to include them in his circle of friends.  See Exhibit 14 (Letter from J. Dominguez).

[27] Id.

[28] Exhibit 12 (Letter from D. Goldner).

[29] Even in subtle ways, Mr. Coughlin Coughlin has always found a way to touch and connect with his friends.  The night before he was planning to secretly ask Katherine's parents for her hand in marriage, Mr. Coughlin's friend Karen Hwang unexpectedly came to D.C. from Los Angeles, where she worked.  Mr. Coughlin went out of his way to rearrange his schedule and spend time with his old friend Karen, who he rarely saw given their geographic distance.  See Exhibit 6 (Letter from K. Hwang).

[30] Exhibit 9 (Letter from R. Thompson).

selected Mr. Coughlin during his senior year to captain the team, a decision grounded in Mr. Coughlin's leadership and ability to inspire his teammates, not solely in his abilities.[31]

Another true testament to Mr. Coughlin's character is that his friends completely trust him with their lives and the lives of their children.  Mr. Coughlin for years has had an ability to connect with children and earn their trust.  In letters to this Court, his friends recount story after story about how Mr. Coughlin has helped their children and been there from the first moments of their birth.[32]  Mr. Coughlin's wife Katherine describes that from the first moments of their relationship, she could see how wonderful he was with children.  It was no surprise to her that Mr. Coughlin's friends referred to him as the "baby whisperer" and that they have trusted him with their children's lives.[33]

Even in the face of his current difficult and stressful legal issues, Mr. Coughlin repeatedly has put his friends (and their children) first.  As his friend Robert Thompson recently wrote to the Court, "Bob embraced our first son Peter like his own. It was a difficult time in Bob's life and he could have easily decided not to be involved.  Peter . . . is shy and Bob is the only adult outside of our family that Peter will run up to and hug.  This didn't happen by accident.  Bob went out of his way to get to know Peter and make him feel comfortable."[34]  It is thus no surprise that Mr. Thompson recently asked Coughlin be the godfather to his newborn son.[35]

Coughlin's friends believe he is a true role model for their children.  Coughlin's current legal problems – interestingly enough, stemming from his close ties to an old friend – have had

---

[31] Id.;  Thirteen years later, Mr. Coughlin was selected to represent the United States Department of Justice in a "friendly" soccer game against a team put together by the Attorney General of Mexico and representing the Mexican Justice Department.  This match was created in an effort to improve bilateral United States-Mexico relations.  Like in high school, Mr. Coughlin was selected for his character and the manner in which he would represent his nation.

[32] See, e.g., Exhibits 10 and 12 (Letters from D. Goldner and D. LaMothe).

[33] Exhibit 1 (Letter from K. Coughlin).

[34] Exhibit 9 (Letter from R. Thompson).

[35] Id.

no impact on this view.  Coughlin's old friend Dr. Wollard succinctly captured the way in which

Mr. Coughlin's friends view him as a role model for their children:

> As a father of four there are a number of qualities that I hope to instill in my
> children.  I would like for my children to be caring, outgoing, polite, leaders
> not followers, self confident but with a sense of humility, good listeners and
> have a strong set of moral values.  *If I could have a blueprint to help shape
> their personalities it would be Bob Coughlin.* [36]

Katherine's brother Dr. Scott Bloemendal also noted the fabulous manner in which Mr.

Coughlin interacts with children, most notably Scott's son.  Scott wrote:  "I knew Bob would be

a great father after watching him with our children over the last few years.  On family vacations,

he often spends a great deal of time with my three year old son . . .  and both of them have the

time of their life.  He is a caring and loving person that I trust with my first born."[37]  Similarly,

Mr. Coughlin's friend Jennifer Dominguez, who served as a Special Assistant United States

Attorney with Mr. Coughlin in the Eastern District of Virginia, described how her three-year old

son "lights up any time his `Uncle Bob' comes to visit."[38]

Mr. Coughlin, throughout his life and career, has been commended for his character and

leadership.  He was a stand-out as a Special Assistant United States Attorney in Virginia and

Washington, D.C.[39]  His supervisors repeatedly recognized that Mr. Coughlin was a "team

player" who distinguished himself by serving others and acting as a "tireless professional."  His

supervisor of several years, Lori Sharpe Day, specifically noted that Mr. Coughlin helped

improve the justice system through his work as a Department of Justice liaison.[40]  Similarly, Ken

Wainstein, the former United States Attorney for the District of Columbia and Mr. Coughlin's

supervisor in several jobs, commended Mr. Coughlin's "genuine commitment to the mission of

---

[36] Exhibit 11 (Letter from C. Wollard) (emphasis added).
[37] Exhibit 7 (Letter from S. Bloemendal).
[38] Exhibit 14 (Letter from J. Dominguez).
[39] Exhibit 14 (Letter from J. Dominguez).
[40] Exhibit 16 (Letter from L. Sharpe Day).

the Justice Department" as well as Mr. Coughlin's priorities in "pursuing the goals of his office and his teammates [more] than with promoting himself."[41]  Likewise, Alice Fisher, the Assistant Attorney General for the Criminal Division of the Department of Justice, and Mr. Coughlin's immediate supervisor for several years, wrote to the Court and described Mr. Coughlin's commitment and dedication to the Department of Justice and its mission.  She described Mr. Coughlin's honesty, integrity, compassion, respect for others, and "above and beyond" approach to the job.  Ultimately, she concluded that in her view, Mr. Coughlin was "loyal and dedicated to the cause of justice."[42]

Mr. Coughlin's dedication to his parents, sister and friends, however, pales in comparison to his utter and uninhibited love and caring for his wife Katherine and brand new baby daughter Grace.  Mr. Coughlin met Katherine in 2003, when they both worked in Washington, D.C.  It would be an understatement to say that it was love at first sight for Mr. Coughlin.  He was immediately smitten by her.  Mr. Coughlin knew immediately that this was the woman with whom he wanted to spend the rest of his life and have a family.  Likewise, Katherine felt the very same way.  As she powerfully put it in her letter to this Court, she is "proud to call him my husband," and, after over four years of marriage, he has exceeded every expectation about the type of father, husband and person he is.[43]

Even though over half of their young marriage has been overshadowed by Mr. Coughlin's current legal problems, Katherine's letter to this Court overflowed with the love she feels for her husband.  She described the kind of friend and partner he is to her, and the kind of father he is for their baby Grace.[44]

---

[41] Exhibit 17 (Letter from K. Wainstein).
[42] Exhibit 18 (Letter from A. Fisher).
[43] Exhibit 1 (Letter from K. Coughlin).
[44] Id.

Those who observe Mr. Coughlin and Katherine cannot help but comment on their love and the wonderful partnership they have forged, certainly through better and worse.  For married couples, it is often the view of the "in-laws" (both parents and siblings) that is most telling.  Katherine's brother Scott, and her parents Lee and Marilyn, have compelling described the kind of person Mr. Coughlin is and the way he treats Katherine.   His in-laws describe him as a "very loving and kind husband and excellent father."[45]

In May 2005, Mr. Coughlin married Katherine.  Mr. Coughlin and Katherine always intended to start a family together.  However, after the legal problems at issue here arose, they put this dream on the back-burner.  While all marriages have challenges and certainly need a little bit of "work" to make them succeed, Mr. Coughlin and Katherine's marriage was challenged right from the start with the government's investigation and prosecution of Mr. Coughlin.  Their love and devotion to each other never faltered, though.  Where Mr. Coughlin could have withdrawn, he did not.  Rather, he even further devoted himself to Katherine and his love for her.  Mr. Coughlin repeatedly has apologized to Katherine for the current legal and financial problems, noting that she "did not sign up for this."[46]  Indeed, as Katherine wrote, "I love him deeply and I believe he is an honest man of unusually strong character.  Nothing about this ordeal has changed that belief in the least.  In fact, his behavior throughout this has confirmed all of my hopes about the type of person I married."[47]

Mr. Coughlin and Katherine, however, did not defer the dream of starting a family indefinitely.  Notwithstanding Mr. Coughlin's legal issues, the two turned their attention to the future and became determined to start a family.  On May 27, 2009, Katherine gave birth to Grace

---

[45] Exhibit 7 and 8 (Letters from Lee and Marilyn Bloemendal, and S. Bloemendal).
[46] Exhibit 1 (Letter from K. Coughlin).
[47] Exhibit 1 (Letter from K. Coughlin).

Elizabeth, a beautiful baby girl.[48]  Mr. Coughlin lives every moment of every day for his new

daughter, doting on her, caring for her, loving her.   Without exception, Mr. Coughlin is

described by those who know him as an incredible father.  He is loving, compassionate,

committed and engaged in her life.  Mr. Coughlin views Grace as a true blessing in his life --

arriving at a time when such a blessing was so appreciated.   While Mr. Coughlin certainly has

not been pleased with the difficulties of finding employment since he pled guilty, the one silver

lining certainly has been the increased amount of time he has spent with his young daughter.

    Mr. Coughlin's complete dedication to Grace is obvious to friends and family alike.  As

one friend put it, Mr. Coughlin "is crazy for Grace and a perfect father and husband."[49]  In

recounting his devotion to Grace, his sister Chrissy – who certainly knows the way in which Mr.

Mr. Coughlin cares for those he loves -- described Mr. Coughlin as "a man full of complete

selflessness and love."[50]  While it is sometimes hard for letters to convey a person's true feelings,

Coughlin's childhood friend David LaMothe poignantly captured Coughlin's deep love for his

wife and daughter when he wrote: "The strength of Bob's character can best be seen in the love

he has for his family.  You can physically see the joy in his eyes when he interacts with his

newborn daughter or talks about the love of his life, his wife Katherine."[51]

    While friends and other family can attempt to describe Mr. Coughlin's love for Grace,

only a protective new mother could truly and best capture those feelings.  As Katherine wrote to

this Court:

>     Seeing Bob with our five month old daughter Grace has confirmed every
> expectation I formed about him as a father.  Grace has been the most
> wonderful indescribable blessing we could ask for.  The only thing that brings
> me more joy than seeing her smile is seeing Bob make her giggle.  He has a

---

[48] PSR ¶ 63; see also Exhibit 2 (photographs of baby Grace Elizabeth Coughlin and her proud parents).

[49] Exhibit 9 (Letter from R. Thompson).

[50] Exhibit 5 (Letter from C. Coughlin); see also Exhibit 7 (Letter from S. Bloemendal).

[51] Exhibit 10 (Letter from D. LaMothe).

hilarious voice and routine he does with her and she erupts in full, loud giggle that makes us melt.  She is his priority.  He often talks to me about the kind of dad he wants to be as Grace grows up, and the type of loving, caring person he hopes she becomes.  In the parent lottery, I'm glad Grace got Bob.[52]

### C.  Mr. Coughlin's Charitable and Community Service

As noted above, Mr. Coughlin has forever been committed to charitable and community service.  This civic imperative was ingrained at an early age by his parents and continues to this day.  Whether he has lived in Kansas City, Evanston, St. Louis, Washington, D.C. or elsewhere, Mr. Coughlin has always gravitated towards helping others in need.  Notably, Mr. Coughlin has never viewed this as a burden or obligation.  Rather, it is very much the way in which he gives more of himself to others.

Helping others and throwing himself into charitable endeavors has *always* been a top priority for Mr. Coughlin.  As one friend put it, "[f]or all of his accolades and accomplishments [in high school, college and law school], the one thing that has stood out over the past twenty-two years is his strong commitment to helping others."[53]  Mr. Coughlin does not take the good things in his life for granted and thus has repeatedly sought to help those in greater need.

As a young boy growing up, his parents instilled a sense of giving to Mr. Coughlin.  He joined his parents working in soup kitchens at the Salvation Army.[54]  He helped deliver meals at Thanksgiving and Christmas to less fortunate members of the community, with a focus on "shut-ins" who simply could not make it out of their homes to get their basic food needs met.[55]  But for Mr. Coughlin, it was not simply an exercise in quickly dropping off a meal and then getting back to the creature comforts of his own home as fast as possible.  To the contrary, he regularly stayed

---

[52] Exhibit 1 (Letter from K. Coughlin).
[53] Exhibit 11 (Letter from C. Wollard).
[54] Exhibit 4 (Letter from J. Coughlin).
[55] Exhibits 3 and 4 (Letters from J. Barry Coughlin and J. Coughlin).

15

with the community members he was helping, assisting them in getting into bed, eating and taking care of basic life activities.[56]

Mr. Coughlin's charitable contributions go far beyond simply writing a check. He always has contributed with his time and sweat. That, after all, is the Coughlin way. Throughout high school, Mr. Coughlin continued the family tradition of serving meals for the homeless at soup kitchen. This no longer was a demand of his parents but had become a labor of love.[57]

In college, Mr. Coughlin founded the Northwestern University arm of a program called "Natural Ties."[58] Although in existence on other college campuses, before Mr. Coughlin jumped in, it did not exist at Northwestern. The "Natural Ties" program paired college students with developmentally disabled peers in the local community. Not only did Mr. Coughlin develop the program in Chicago, but he touched the life of his "buddy," a young man named Charlie afflicted with Down's Syndrome. Mr. Coughlin embraced Charlie and made him part of his life. For the duration of Mr. Coughlin's college years, Charlie was a regular at Mr. Coughlin' house, at dinners and parties. Charlie's trust in Mr. Coughlin was demonstrated time and time again, and perhaps most notably when Charlie asked Mr. Coughlin to become involved in his Special Olympics efforts.[59] Also while in college, Mr. Coughlin volunteered at a battered women's shelter.[60]

After law school and upon his return to Washington, D.C., Mr. Coughlin continued his charitable activism in earnest. A full-time job and other responsibilities did not diminish his passion for helping others. In D.C., Mr. Coughlin delivered food to the homeless every Monday

---

[56] Exhibit 4 (Letter from J. Coughlin).
[57] Exhibit 11 (Letter from C. Wollard).
[58] Exhibits 3 and 11, 12 (Letters from D. Goldner, C. Wollard, J. Barry Coughlin).
[59] Exhibit 12 (Letter from D. Goldner).
[60] Exhibit 4 (Letter from J. Coughlin).

25312648

night through his church, Christ Church in D.C. as part of a soup kitchen effort.[61]  Additionally,

Mr. Coughlin mentored a student in the Washington D.C. high school system.[62]

As the post-9/11 wars in Iraq and Afghanistan continued to be fought by American

soldiers, Mr. Coughlin turned some of his charitable efforts towards helping servicemen and

women.  Specifically, Mr. Coughlin and Katherine adopted a military family through Walter

Reed Hospital and actively participated in the USO gift program.[63]  He and Katherine also

actively worked annually on the Adopt-an-Angel program at both Christ Church and the

Salvation Army.[64]

When his legal troubles began, Mr. Coughlin sat at a crossroads.  He could have chosen

to focus inward and no longer extend himself to those more needy, or he could have continued

his life-long efforts to help others.  For Mr. Coughlin, it was an easy choice: help those less

fortunate.  Mr. Coughlin's charitable efforts have continued to this day.   When he returned to

Kansas City in 2008 to find a job, the job market was (and remains) extraordinarily tough for

him given the nature of the economy and the fact he unfortunately returned as a convicted felon.

As a result, he had extra free time on his hands.  When a friend asked whether he would spend

this time playing golf, Mr. Coughlin responded: "I don't think so.  I'm going to start

volunteering serving meals at a homeless shelter or delivering meals to the elderly."[65]  And that

is precisely what he has done since returning to Kansas City – continued to focus on helping

others in need. [66]

---

[61] Exhibits 1, 3, 4 and 16 (Letters from L. Sharpe Day, J. Barry Coughlin, J. Coughlin and K. Coughlin).
[62] Exhibit 3 (Letter from J. Barry Coughlin).
[63] Exhibits 1, 4 and 11 (Letters from C. Wollard, J. Coughlin, K. Coughlin).
[64] Exhibit 4 (Letter from J. Coughlin).
[65] See Exhibit 11 (Letter from C. Wollard).
[66] Mr. Coughlin's high school friend David LaMothe described to this Court Mr. Coughlin's willingness to throw himself into a fundraising event for his mother-in-law -- a woman Mr. Coughlin did not even know -- afflicted by ALS.  It simply did not matter that Mr. Coughlin had

17

Since returning to Kansas City, Mr. Coughlin once again delivers meals to people who are shut-in their apartments in East Kansas City.[67]  Similarly, he has helped run fundraisers for friends.[68]  One of the organizers for a recent charitable effort described Mr. Coughlin has "one of my go to guys" when it came to helping others less fortunate.[69]  One example given in letters to this Court was Mr. Coughlin's standing out in the pouring rain at the crack of dawn in near freezing weather to sell newspapers to help underprivileged children attend summer camp.[70]

    **D.**    **Mr. Coughlin's Professional Career and Close Friendship with Kevin Ring**

    **1.**    **1999-2001: Mr. Coughlin's Years at the Senate**

After law school, Mr. Coughlin did precisely what he had hoped to do – continue his work in public service with the government.  He turned down law firm offers and instead returned to Capitol Hill.  His first post-law school job on the Hill was as a legislative counsel for the United States Judiciary Committee.  There, he worked closely with Paul Clement, David Ayres, Jeffrey Taylor, Ken Wainstein and others.  Consistent with the values instilled in him by his family, Mr. Coughlin did whatever was asked of him -- assisting in drafting legislation, briefed constitutional issues, provided guidance on property issues and pitched in across the board.   As described in detail below, after over two years with the Judiciary Committee, Coughlin moved to the Department of  Justice.[71]

---

other personal matters to which to attend nor that he had never met the woman – he became part of the effort.  And, months later when the woman sadly passed away, Mr. Coughlin was one of the first people to attend her visitation.  Exhibit 10 (Letter from D. LaMothe).
[67] Exhibit 5 (Letter from C. Coughlin).
[68] Exhibit 9 (Letter from R. Thompson).
[69] Id.
[70] Id.
[71] PSR ¶¶ 10, 70.

## 2. __Mr. Coughlin's Close Friendship with Kevin Ring__

As described above, Mr. Coughlin met Kevin Ring in 1992 during Coughlin's very first stint on Capitol Hill as an intern.  As the low men on the totem pole in a bustling Congressional office, and as 21-year olds in Washington, D.C., they became close friends.  Their friendship continued for the next 15 years, until it became clear to Mr. Coughlin that this very friendship with Ring led him into the instant legal problems.[72]

Their friendship was not borne out of lobbying or influence-peddling or any other arguably untoward activity.  They were friends long before Ring was a lobbyist or Mr. Coughlin worked at the Justice Department.  Rather, and it is not disputed by the government, they were genuinely close and longtime friends.[73] They socialized together over meals and drinks, sports and golf.  They talked politics, football and family.  Mr. Coughlin hosted Ring for dinners at his apartment and looked out for Ring when he was sick and recovering from surgery.  Likewise, Ring was there for Mr. Coughlin as he went through the law school application process and as they both hunted for jobs.  Even after Mr. Coughlin left D.C. to go to law school in St. Louis, he maintained his friendship with Ring.

Around 1999, Kevin Ring left his work on the Hill and entered private practice; in 2001, Ring went to work with Jack Abramoff at Greenberg Traurig.[74]  When Mr. Coughlin returned to D.C. in 1999, Mr. Coughlin's relationship with Kevin Ring remained the same.  They continued to do the same things they always had -- sports, golf, community endeavors, drinking and eating.

Over time, however, one aspect of their relationship did evolve: Kevin Ring began to pay for more of their meals, drinks and entertainment.  Kevin Ring no longer was in government

---

[72] Even the government's own star trial witness at the Ring trial, Todd Boulanger, testified that Kevin Ring and Bob Coughlin had an "old relationship."  09/24/09 Ring Trial Tr. 35 (PM Session).

[73] 09/11/09 Ring Trial Tr. 68.

[74] Exhibit 21 (Statement of the Offense, ¶¶ 3-4).

service and instead was earning a robust salary at a prominent international law and lobbying firm.  Needless to say, he had a great deal more discretionary money.  Mr. Coughlin also was aware that in general, Kevin was most likely not paying for many of these expenses out of his own pocket.  Although there were occasions where Mr. Coughlin believed Kevin Ring personally paid for a night out, Mr. Coughlin firmly believed, as acknowledged by the government in the Statement of Offense, that an expense account at Greenberg Traurig paid for the drinks and meals.

There is no question that Mr. Coughlin benefited from Ring's generosity and made use of the perks.  Mr. Coughlin believed that Ring, through Greenberg Traurig, had access to extra sports and concert tickets when they were available and not being used by others at the firm.  Mr. Coughlin from time to time asked Kevin for tickets for special events, such as when family came to town.

What became clear in hindsight was that over time Kevin Ring took advantage of their friendship.  In a sad twist of fate, Mr. Coughlin's greatest attribute -- his trust in and dedication to friends -- became his undoing.[75]  Unbeknownst to Mr. Coughlin, Ring abused their relationship and misled Mr. Coughlin.[76]  Ring traded on Mr. Coughlin's name.  Ring pushed Mr. Coughlin to provide information from the Justice Department.  Ring apparently billed his clients for time spent with Mr. Coughlin, and charged their socializing together back to the clients.  As Assistant United States Attorney Leotta described during a number of Mr. Coughlin's cooperation debriefing sessions, Mr. Coughlin was a victim of Ring's wrongdoing.  It is

---

[75] As Noel Francisco, former Deputy Assistant Attorney General in the Office of Legal Counsel and former Associate Counsel to the President of the United States, so succinctly noted in his letter to the Court, "this salutary trait, rather than any wrongful intent, is the cause of [Coughlin's] present circumstances."  Exhibit 15 (Letter from N. Francisco).

[76] In multiple proffer and cooperation debriefing sessions with the government, Assistant United States Attorney Leotta and his lead law enforcement agent Jason Higley repeatedly emphasized to Mr. Coughlin the government's position that Ring had -- in their words -- "duped" and "misled" Mr. Coughlin.

25312648

undisputed that Mr. Coughlin had absolutely no idea that a client was paying for any of these expenses or that Ring billed many of the hours they spent socializing together back to a client.[77] Moreover, and the government concedes, Mr. Coughlin was totally unaware that Kevin Ring held Mr. Coughlin out to clients as an important contact.[78]  Put simply, and as AUSA Leotta has confirmed, Mr. Coughlin was duped by Ring.

What is also completely clear, and not disputed by the government, is that Mr. Coughlin was in no way part of "Team Abramoff".[79]  Rather, Mr. Coughlin was a government employee that Team Abramoff tried to corrupt.[80]  The other players at the heart of the so-called Abramoff conspiracy did not even know Mr. Coughlin.  For example, star government Ring trial witness Neil Volz  testified about Mr. Coughlin: "I wouldn't know him if he walked into this room."[81] Of importance, Mr. Coughlin did not even know Jack Abramoff, may not ever have actually met him and certainly never spoke to him about anything of any substance.[82]  Likewise, Mr. Coughlin had little or no dealings at all with Todd Boulanger.[83]

In contrast, Mr. Coughlin's circle of friends in D.C. were people he had met on Capitol Hill, and with whom he worked at the Justice Department.  He regularly watched ball games, participated in community and charitable events and socialized with his friends from his Senate days – Paul Clement, Jeffrey Taylor, and Kevin Ring.

---

[77] Exhibit 21 (Statement of the Offense, ¶ 7).
[78] Id.
[79] 09/11/09 Ring Trial Tr. 3, 9-11.
[80] 09/11/09 Ring Trial Tr. 12-13.
[81] See, e.g., 09/15/09 Ring Trial Tr. 96 (PM Session)( Testimony of Neil Volz).
[82] Exhibit 21 (Statement of the Offense, ¶ 5).
[83] As the Kevin Ring trial made clear, Abramoff employed a team of lobbyists and influence peddlers.  As the trial record also made clear, Bob Coughlin did not play in this circle.

25312648

### 3.   Mr. Coughlin's Work at the Department of Justice and the Offense Conduct.

In March 2001, Mr. Coughlin continued his march towards a life in public service.  He left the Senate Judiciary Committee and moved down Pennsylvania Avenue to the Department of Justice, where he served for over six years in a variety of jobs.[84]

Mr. Coughlin's first job at the Department of Justice was a Special Assistant to the Assistant Attorney General for Legislative Affairs.  Notwithstanding this ostensibly exciting title, the job was a very basic one: Mr. Coughlin served as a low-level liaison between the Department of Justice and Congress.  When staffers on the Hill had issues that needed to be brought to the attention of one of the many arms of the Justice Department, they reached out and contacted Mr. Coughlin or one of his colleagues.  His job was not to make policy or even make any decisions of any sort; rather, it was simply to ensure that the right people in Congress were put in touch with the right people at the Department of Justice.[85]  As his supervisor Lori Sharpe Day noted in her letter to the Court, Mr. Coughlin distinguished himself in this position, greatly helping the justice system by effectively serving as a liaison.[86]

After a year, Mr. Coughlin's title changed, but the job in sum and substance remained the same.  In June 2002, he was named Deputy Director for the Office of Intergovernmental and Public Liaison ("OIPL").   Like his job at DOJ Legislative Affairs, Mr. Coughlin's role there was to facilitate communications between the Department of Justice and the public – including state officials, other federal agencies, municipalities, public citizens and lobbyists.   Again, his job here was simply one of liaison.  As one of the government's own witnesses at the Kevin Ring trial -- the Deputy Director of OIPL -- made clear, "we would get input from various groups and organizations about pending matters before the department.  We would answer questions. Again,

---

[84] PSR ¶¶ 11, 81.
[85] 09/11/09 Ring Trial Tr. 19-20; PSR ¶ 11.
[86] Exhibit 16 (Letter from L. Sharpe Day).

we were a conduit between the department and outside groups," which included being a liaison with lobbyists.[87]  When someone from outside the Justice Department needed assistance from some division of the Department of Justice, Mr. Coughlin (like all of the other members of OIPL) served to direct them to the right place.  That was their job.  When the mayor of a southwestern border town needed assistance on immigration issues, she might seek direction through Mr. Coughlin.  When a staffer for the attorney general of western state had a question about water rights and DOJ policy, the call might come in to Mr. Coughlin.

Similarly, as the Kevin Ring trial made clear, lobbyists often worked through Legislative Affairs and OIPL when seeking guidance and assistance from DOJ.  That was proper, appropriate and in many ways, a core function of OIPL.  The Ring jury learned throughout the trial that "part of [Coughlin's] job was, frankly, to interact with lobbyists."[88]   There is no question and the government regularly has conceded that the government is in possession of numerous e-mails and records of many times that Mr. Coughlin assisted many members of the public, other government officials and most likely other lobbyists.[89]  In the overwhelmingly vast majority of these instances, Mr. Coughlin had no prior relationship or friendship with those making the request.  They asked a question and he either provided assistance where he could or directed them to the right government agency or person.[90]

Despite the job title, it is also widely accepted that Mr. Coughlin had virtually no power at these jobs.  He could not initiate legislation or make policy.  He could not approve grant

---

[87] 09/22/09 Ring Trial Tr. 6 (PM Session).
[88] 09/11/09 Ring Trial Tr. 68.
[89] Mr. Coughlin has *not* had access to the thousands of e-mails relevant to the broader Abramoff investigation, nor even to the e-mails he sent and received while at DOJ.  During the plea negotiations, Mr. Coughlin requested access but was denied it by the government prosecutors, who noted that Rule 16 obligations did not kick in until post-indictment.
[90] It is noteworthy that the vast majority of references to Coughlin during the Ring trial had to do with legal maneuvering, legal issues before the Court and evidential matters.  Ultimately, there was very little testimony at all about any influence Coughlin had on any Department of Justice decisions.

money or direct funds.  As the jury heard over and over again in the Kevin Ring trial, "Coughlin simply didn't have the power to make this happen."[91]  The jury, which ultimately hung with regard to any wrongdoing, learned that "Mr. Coughlin . . . was not in a position to do anything. He was not a decision-maker on a single issue."[92]  Indeed, as the government's star witness Todd Boulanger made clear at the Ring trial, Mr. Coughlin was "not a decision-maker" and "wasn't the one who made the decision" on relevant issues.[93]

It is at this very crossroads -- where his old friend Kevin Ring lobbied him while Mr. Coughlin was at the Department of Justice -- that Mr. Coughlin got himself into the trouble that puts him before this Court now for sentencing.  Mr. Coughlin's conduct that gives rise to the single conflict of interest charge here is quite simple:  between 2001 and 2003, while a low-level Department of Justice liaison employee, he took meals, drinks concert tickets and sports tickets collectively worth approximately $4,800 from his close friend Kevin Ring.[94]  Mr. Coughlin never took cash, never received gratuities nor ever took any action that remotely approached a bribe.  Mr. Coughlin took these drinks, meals and tickets while he was between the ages of 29 and 31.  At the same time, Kevin Ring (on behalf of clients and his law/lobbying firm) had business in front of the Department of Justice and Mr. Coughlin.  Unbeknownst at the time to Coughlin, Kevin Ring attempted to use his relationship with Mr. Coughlin to gain access and information at the Department of Justice.

*At the time*, Mr. Coughlin did not realize that his taking items of value from Ring, while at the same time handling work related Mr. Ring was a conflict of interest.  Indeed, on occasions

---

[91] 09/11/09 Ring Trial Tr. 21.

[92] 09/11/09 Ring Trial Tr. 69.

[93] 09/24/09 Ring Trial Tr. 33 (PM Session).

[94] There is no claim that Mr. Coughlin took anything from Ring (or anyone else) when he returned to Main Justice in 2005 as the Deputy Chief of Staff to the Criminal Division.  Rather, the offense conduct occurred solely while he was at Legislative Affairs and OIPL between 2001 and 2003.

he sought ethics guidance and was told that his conduct was acceptable.  It did not even cross his

mind that he had wandered into an area of questionable ethics, let along criminality.  However,

in hindsight and upon reflection, Mr. Coughlin fully recognized the problems with his actions,

and promptly and immediately accepted responsibility for this conduct.  At the time, from his

viewpoint, Mr. Coughlin treated Kevin Ring in exactly the same manner he treated all requests

he handled.  He provided information to Mr. Ring.  He passed Mr. Ring's requests along to his

superiors, such as Deputy Assistant Attorney General Tracy Henke and the Attorney General's

Chief of Staff David Ayres -- two Department of Justice officials with the real power.

Ultimately, Mr. Coughlin's handling of several issues while at the same time his taking

things of value from Ring, led to his troubles.  Most notably, the Choctaw grant money and the

Eshkol Academy INS issues raised concerns.  With regard to the Choctaw grant money, Mr.

Coughlin was in absolutely no position to affect the grant money.  To the contrary, his sole role

was to direct Kevin Ring to Trace Henke, David Ayres and others.  As the Ring trial made clear

to this Court, decisions ultimately were made about this money, but Mr. Coughlin had absolutely

nothing to do with those decisions.[95]  From one of Ring's first requests, Mr. Coughlin made clear

that he viewed his role as a Department of Justice liaison attorney to direct queries to the right

Department function.  In an e-mail of April 16, 2001, Ring asked Mr. Coughlin about the

Choctaw money and Mr. Coughlin responded, unequivocally, "What is the issue and I will figure

out who handles it."[96]  On July 18, 2001, Ring again sent an inquiry to Mr. Coughlin who again

fulfilled his liaison responsibilities and informed Ring that Tracy Henke was the responsible

attorney for Choctaw money.[97]  Over and over again throughout the Ring trial, the jury was made

---

[95] See Ring Government Trial Exhibit 562 (making clear that Tracy Henke and David Ayres were at the heart of the Choctaw grant money decision and that Mr. Coughlin had nothing to do with the decision-making).

[96] Ring Government Trial Exhibit 501; 09/21/09 Ring Trial Tr. 27 (AM Session).

[97] Ring Government Trial Exhibit 511; 09/21/09 Ring Trial Tr. 32 (AM Session).

aware that it was not Coughlin, but rather much higher level Department of Justice officials that wielded any authority related to Choctaw money.[98]  Indeed, when one government witness and former DOJ official was asked about Coughlin's role, he made clear that he had never even dealt with Mr. Coughlin on this very issue.[99]  When Todd Boulanger -- one of the lobbyists central to the Abramoff story and the government's star witness -- testified, he too described instances where Mr. Coughlin identified someone else who was in a position to help the Abramoff team. Specifically, Mr. Coughlin informed him, "Karen Wilson from OLA handles this issue."[100]  And again, when asked by Ring on another occasion about the Choctaw money and a particular letter, Mr. Coughlin simply sent the information along up the chain, informing Ring that he (Coughlin) will "pass [the letter] along to the appropriate people."[101]  Boulanger went even further, making clear for this Court and the jury that Mr. Coughlin did not decide whether the Choctaw could sole-source the jail, did not write any language for terrorism bills, did not change any legislative language, did not make any decisions that benefited the Abramoff Saginaw/Chippewa clients.[102]

Incredibly telling is another e-mail exchange that occurred *after* the Choctaw money had been awarded by Tracy Henke and David Ayres.  The e-mail makes clear that Mr. Coughlin did not even know that a decision had been made, further unequivocally demonstrating that he had absolutely nothing to do with the decision-making.  Specifically, on February 8, 2002, Mr. Coughlin wrote to Ring and inquired about the resolution of the grant money.  It was *Mr. Coughlin* who asked Mr. Ring (and not the other way around), clearly demonstrating Mr. Coughlin's lack of involvement in the decision-making process.[103]

---

[98] 09/21/09 Ring Trial Tr. 63 (AM Session), *passim.*
[99] 09/21/09 Ring Trial Tr. 72 (AM Session).
[100] Ring Government Trial Exhibit 502; 09/23/09 Ring Trial Tr. 17 (PM Session).
[101] Ring Government Trial Exhibit 530; 09/23/09 Ring Trial Tr. 49 (PM Session ).
[102] 09/24/09 Ring Trial Tr. 33-34 (PM Session).
[103] Exhibit 19 (email from R. Coughlin to K. Ring).

Another one of Mr. Coughlin's actions that gave rise to the charge here related to the Eshkol Academy.  Mr. Coughlin forwarded an e-mail from Kevin Ring to someone at the Immigration and Naturalization Service with a note that said: "I don't know if anything can be done about this.  If not, let me know so I can tell them."[104]  Specifically, Coughlin wrote: "Su [Daly], thank you for looking into this.  I don't know if anything can be done but I said I would look into it.  If for any reason nothing can be done, please e-mail so I can pass that along."[105] Here, Coughlin certainly pushed no agenda or sought any particular result; rather, he forwarded an e-mail with an express disclaimer about the outcome.  Todd Boulanger's trial testimony on the Eshkol Academy made clear that Coughlin was merely a liaison or conduit.  At one point at the Ring trial, Boulanger testified about an e-mail Coughlin sent where Coughlin merely wrote to someone higher up the chain, "do you know anyone at INS who could possibly take a look at this inquiry?  This is not a priority, but I would like to have someone looking into this."  Coughlin again was not pushing an agenda or even attempting to expedite a review.[106]  Rather, he was doing what his bosses required him to do:  passing requests made by the public or lobbyists along to the right people at the Justice Department.

But Mr. Coughlin mistakenly trusted his old friend Kevin Ring.  Always one to see good in his friends, Mr. Coughlin did not even stop to consider the fact that Ring might be taking advantage of their friendship for his clients, for his boss Jack Abramoff or for his lobbying firm. Yet Mr. Coughlin recognizes that he should not have handled Ring's Department of Justice business while at the same time continuing their friendship and accepting meals, drinks and

---

[104] 09/11/09 Ring Trial Tr. 69-70.

[105] Ring Government Trial Exhibit 599A; 09/22/09 Ring Trial Tr. 9-10 (PM Session); 09/25/09 Ring Trial Tr. 42 (AM Session).  It is also worth noting that Coughlin was one of several government officials who inquired about the Eshkol matter, demonstrating the lack of importance of Coughlin in this process.  09/25/09 Ring Trial Tr. 57-58 (AM Session).

[106] Ring Government Trial Exhibit 600; 09/25/09 Ring Trial Tr. 41 (AM Session ).

tickets.  In hindsight, it is clear to Mr. Coughlin that he either should have refused these tickets or paid for them himself.  He did not and in failing to do so, violated 18 U.S.C. § 208.

In November 2003, Mr. Coughlin left his job at OIPL and sought courtroom prosecutorial experience.  He first served as Special Assistant United States Attorney ("SAUSA") for the Eastern District of Virginia and then in Washington, D.C.[107]  As a SAUSA in the Eastern District of Virginia, Mr. Coughlin spent his days and long nights handling a wide variety of federal criminal cases.  Because he lived near Capitol Hill and worked long hours in Alexandria, Virginia, he rarely socialized with his old friends in downtown D.C.  As a  Special Assistant United States Attorney, he distinguished himself as a hard worker who was relied on by colleagues throughout the office.[108]

After nearly two years as a SAUSA, in June 2005, Mr. Coughlin returned to main Justice, this time as the Deputy Chief of Staff to the Criminal Division.[109]  There, Mr. Coughlin worked for Assistant Attorney General Alice Fisher, handling matters related to Hurricane Katrina fraud, anti-gang efforts and the day-to-day management of the large Criminal Division.  In this position, Mr. Coughlin took a leadership role in overseeing the multi-jurisdictional efforts to combat the widespread post-Katrina fraud.  His efforts were recognized Department-wide and he ultimately received the Attorney General's Award for his work with the Hurricane Katrina Task Force on Fraud.[110]  Ms. Fisher's view of Mr. Coughlin's efforts were quite revealing:  she saw him as dedicated to the cause of justice, and loyal to the Criminal Division and its employees.[111]

In April 2007, Coughlin voluntarily resigned from the Department of Justice.  After being approached by investigators from the DOJ, Office of Inspector General, and realizing that he

---

[107] PSR ¶ 81.
[108] Exhibit 17 (Letter of K. Wainstein).
[109] PSR ¶ 81.
[110] PSR ¶ 82; Exhibits 3, 4, 15-18 (Letters from J. Barry Coughlin, J. Coughlin, L. Sharpe Day, N. Francisco, K. Wainstein, and A. Fisher).
[111] Exhibit 18 (Letter from A. Fisher).

himself had unwittingly become a subject of the investigation, Mr. Coughlin did not want to bring any more possible harm to the Department that loved so dearly.  Notwithstanding the strong support of his supervisors and colleagues, Mr. Coughlin elected to resign.[112]

Mr. Coughlin's work at the Department of Justice was widely praised.  He was repeatedly promoted within the Department, ultimately finishing as the Deputy Chief of Staff to the Assistant Attorney General for the Criminal Division.   As noted above, he received the coveted Attorney General's Award for his work with the Hurricane Katrina Task Force on Fraud.[113]  His former bosses and colleagues have written the Court, demonstrating their strong support for Mr. Coughlin, both as a person and as a colleague.[114]

### E.   Mr. Coughlin's Life After the Department of Justice

Mr. Coughlin's life has been very difficult since leaving the Department of Justice.  After voluntarily resigning, he remained unemployed for a number of months.  He and his wife ultimately sold their D.C. home.  Between the fall of 2007 and spring of 2008, he worked as a business consultant for a Kansas City company.  When he entered his guilty plea in April 2008, he stopped working.  He remained unemployed until April 2009.  Even then, when he finally got a job, he received no salary, merely hoping he could get paid down the road.[115]

During these periods of unemployment, Mr. Coughlin and Katherine utilized savings he had stored up during his ten prior years of employment as well as money made from the sale of his D.C. home.[116]  Mr. Coughlin and Katherine also relied heavily on friends and family.  They

---

[112] PSR ¶ 81.
[113] PSR ¶ 82; Exhibits 3, 4, 15-18 (Letters from J. Barry Coughlin, J. Coughlin, L. Sharpe Day, N. Francisco, K. Wainstein, and A. Fisher).
[114] Exhibits 16, 17 and 18 (Letters from L. Sharpe Day, K. Wainstein,  and A. Fisher).
[115] PSR ¶¶ 84-88.
[116] PSR ¶¶ 91-98; Exhibit 1 (Letter from K. Coughlin).

25312648

moved apartment-to-apartment and often stayed for extended periods of time with family members.[117]

In April 2009, Coughlin was hired as a consultant with NanoCell Biologics, Inc., a small bio-tech start-up whose purpose is to develop technology to create better and more painless ways to administer pain medicine.[118] Coughlin is not paid any salary in this job.  Rather, he will earn money down the road if the company succeeds.  Coughlin took this job, though, because he embraced NanoCell's mission of developing technology to help others, of finding a way to improve pain medication delivery and because he sought to continue to find ways to move forward with his life.

Early this month, Coughlin accepted a part-time paying job with an organization that places environmentally sound and "green" products in retail stores.  Not only does this job help pay the bills, but it is for a good cause.  Moreover, for the first time in over eighteen months, Mr. Coughlin and Katherine have a stream of income enabling them to rely a little bit less on family friends and to be a little bit more self-sufficient.

## II.     A SENTENCE OF NO JAIL TIME IS APPROPRIATE IN THIS CASE

### A.     Legal Framework for Sentencing Analysis under *Booker* and *Gall*

Recent Supreme Court case law makes it clear that sentencing courts are to consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a).  Gall v. United States, 128 S.Ct. 586 (2007); Kimbrough v. United States, 128 S.Ct. 558 (2007); United States v. Booker, 543 U.S. 220 (2005).  These factors include:  the nature and circumstances of the offense and the history and characteristics of the defendant; id. 18 U.S.C. § 3553(a); the need for the sentence imposed to satisfy each of the various goals of sentencing including promoting respect for the law, reflecting the seriousness of the offense, affording adequate deterrence to criminal conduct,

---

[117] PSR ¶¶ 84-86; Exhibit 1 (Letter from K. Coughlin).
[118] PSR ¶¶ 87-88.

30

protecting the public from further crimes of the defendant, and providing the defendant with needed training; id. § 3553(a)(2); any pertinent policy statement; id. § 3553(a)(5); and the need to provide restitution to the victims. Id. § 3553(a)(6).  The Supreme Court in Kimbrough explained that Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." 128 S.Ct. at 570.  Indeed, based on its evaluation of all of the §3553(a) factors, the Court may elect to impose a non-Guidelines sentence -- including a sentence substantially deviating from the advisory Guidelines range -- "based solely on policy consideration, including disagreements with the Guidelines." Kimbrough, 128 S.Ct. at 570.

### B.    Consideration of All § 3553(a) Factors Supports a Sentence of No Jail Time

The totality of the § 3553 factors overwhelmingly supports a sentence of no jail time, or alternatively of time served.  A non-incarceration sentence will be sufficient to accomplish all of the traditional goals of sentencing.  Given the nature of the criminal offense, Mr. Coughlin's prompt and repeated acceptance of responsibility, his full and complete cooperation with the government, his commitment to public service and family, the crippling impact of a jail sentence on his newborn daughter and family, and other factors, a sentence without incarceration not only is entirely appropriate, but also is most consistent with the facts and circumstances here. Moreover, and importantly, no societal interest weighs in favor of incarcerating Mr. Coughlin and hurting his family and those who rely on him..

### 1.    Mr. Coughlin's Advisory Guidelines Range

Although a defendant's sentencing range under the United States Sentencing Guidelines is no longer binding, or even presumptively reasonable, Gall, 128 S.Ct. at 596-97, the sentencing Court is to apply the factors set forth in 18 U.S.C. § 3553(a).  Booker, 543 U.S. at 220.  While

25312648

courts still must take into account the relevant Guidelines calculations as part of reaching an appropriate sentence, Gall, 128 S.Ct. at 596, the advisory Guidelines are only one of the factors to be considered in imposing sentence.  Id. at 602.  Mr. Coughlin fully recognizes that the Court is free to make its own independent determination of the Guidelines range.  However, given the nature of the criminal conduct and what the government could actually prove in Court, the government and Mr. Coughlin, with one minor dispute, recognized a stipulated Guidelines Range in the written plea agreement.

Here, Mr. Coughlin pleaded guilty to a single violation of 18 U.S.C. § 208 (conflict of interest).  Using the 2002 Guidelines, the base offense level is found in U.S.S.G. §2C1.3(a), which provides for a base offense level of six.  Because § 2C1.3(c)(1) is cross-referenced, the base offense level is seven.[119]  Because the offense involved more than one gratuity, the offense level is increased two levels pursuant to § 2C1.2(b)(1).   Because the value of the gratuities exceeded $2,000 but did not exceed $5,000, the offense level is to be further increased one level pursuant to § 2C1.2(b)(2)(A)(i).[120]

Mr. Coughlin has repeatedly and fully accepted responsibility in this matter.[121]   This clear demonstration of acceptance of responsibility under U.S.S.G. § 3E1.1(a) entitles Mr.

---

[119] Mr. Coughlin did not plead guilty to taking or receiving a gratuity of any kind.  Indeed, under Valdes v. United States, 437 F.3d 1276 (D.C. Cir. 2006). Mr. Coughlin's conduct and *mens rea* certainly did not give rise to any such charges.  However, given the general nature of the offense as well as the efforts to resolve this matter through a plea, Mr. Coughlin accepted the government's insistence on the applicability of § 2C1.3(c)(1).

[120] As discussed in detail in Section II.B.1.A. below, the government contends that two Washington Redskins football tickets, with a face value of $77.25 each, should be valued at nearly $900, far more than any other seat in the entire stadium.  Using this calculation, the government then claims that the "loss" amount exceeds $5,000.  For this reason alone, the government seeks a two (not one) level enhancement pursuant to § 2C1.2(b)(2)(A)(ii).  This argument is without support and should be rejected.  The resulting offense level, after acceptance of responsibility, and prior to taking into account Mr. Coughlin's substantial cooperation, should be eight.

[121] The government has raised concerns about the extent to which Mr. Coughlin has accepted responsibility.  These issues are addressed in detail in Section II.C. below.

Coughlin to a two-level reduction of offense level.  Coughlin has always readily admitted that he took the items of value:  a number of meals and drinks, and tickets to seven sporting events and four rock concerts.  And, he has fully acknowledged that Kevin Ring had business in front of him and the Justice Department.   Moreover, Mr. Coughlin has embraced that his taking the items of value while at the same time having Kevin Ring's business before him posed a conflict of interest.

Mr. Coughlin's acceptance of responsibility began at the very first meeting he had with the Department of Justice's Office of Inspector General agents and federal prosecutors, and has extended to the present.  He accepted responsibility during his very first interview with the government, even while still employed by the Department of Justice.  He resigned voluntarily, rather than create additional problems for his employer.  During numerous (more than 10) in-person and telephonic meetings with government prosecutors and law enforcement agents between April 2007 and September 2009, Mr. Coughlin repeatedly has accepted this responsibility.  Mr. Coughlin on numerous occasions also accepted responsibility through statements of his attorney during his attorney's conversations with DOJ agents, prosecutors and officials.   Mr. Coughlin pleaded guilty pursuant to an Information, allowing the government to proceed without an Indictment.   Mr. Coughlin accepted responsibility by signing the written plea agreement, signing the Statement of Offense and by admitting his conduct during the in-court guilty plea colloquy.  Moreover, Mr. Coughlin has fully cooperated with the government and provided substantial assistance in the investigation and prosecution of others, further demonstrating his acceptance of responsibility.  Mr. Coughlin expressly accepted responsibility during his Grand Jury testimony in September 2008.  Because this clear demonstration of acceptance of responsibility more than satisfies U.S.S.G. § 3E1.1(a), Mr. Coughlin is entitled to a two-level reduction of offense level, resulting in a total offense level of six.

Given no criminal history (resulting in Criminal History Category I) and a total offense level of 6, Mr. Coughlin's sentencing range is zero-to-six months, in Zone A.

### A.     The Loss Amount Should be Calculated at Less than $5,000

As noted above, the only guidelines issue in dispute between Mr. Coughlin and the government relates to the loss amount to be calculated pursuant to U.S.S.G. § 2C1.2(b)(2).[122] More specifically, the disagreement turns on the valuation of two tickets to a single Washington Redskins game attended by Mr. Coughlin. If the Redskins tickets are valued in the same manner that every other dollar figure was considered in this case -- by looking merely at the face value of the ticket or receipt -- the cumulative total of the value of items received by Mr. Coughlin is approximately $4,800. In contrast, the government would have the Court believe that these Redskins tickets to a game between the 0-5 Redskins and 1-4 Carolina Panthers are worth more than the next most expensive seats to the game, and somehow worth nearly five times more than face value.[123] The government's unsupported strained construction should be rejected.

---

[122] Mr. Coughlin has disputed the government's creative valuation theories throughout this entire matter. First, in Section 3.A. of the Plea Agreement, Mr. Coughlin disagreed with the government position. Second, Paragraph 25 of the Statement of Offense made clear that Mr. Coughlin and the government disagree: "The government estimates that the value of the things of value that Coughlin received for or because of his official acts performed or to be performed was approximately $6,180. Coughlin estimates that the value was approximately $4,800." Third, at the April 22, 2008 guilty plea proceeding, the parties and the Court expressly recognized this disagreement in valuation. See 04/22/08 Tr. 9-10 (plea proceeding). Finally, the PSR recognizes this disagreement. PSR ¶ 5.

[123] The government's theory appears to stem from the cost of Abramoff's suite to Abramoff, regardless of any value derived from Coughlin. Apparently, Suite 363 tickets for the 2001 season cost Abramoff $61,219.80 for the season. Dividing by 140 (14 seats per game for 10 games), each share cost approximately $437. Oddly, and without any explanation based in law, the government's position with regard to the valuation of these tickets has shifted throughout this case. During plea negotiations, the government insisted that these tickets should be valued at $1,125 per ticket, an astounding figure. For obvious reasons, Mr. Coughlin refused to accept this figure. It appears that the government now continues to ignore the Redskins valuation of the ticket as well as the face value of the ticket and instead embrace a mathematical formula derived from Jack Abramoff's benefits from the tickets, not Robert Coughlin's.

What is causing the difference between Mr. Coughlin's position and the government's position is quite simple:  the valuation of two tickets in a suite to a single Washington Redskins football game -- the October 21, 2001 football game between the Washington Redskins and the Carolina Panthers.  Some facts are not in dispute and are conceded by the government.  First, *the face value on the tickets themselves is $77.25 per ticket (thus totaling $154.50 for the pair)*. Second, the tickets were part of a multi-year suite ownership owned by Jack Abramoff and/or his law/lobbying firm.  Third, the highest priced tickets available to the public for a Washington Redskins game in 2001 were $ 3,200 for a ten game season, or $320 per game, which is significantly less than the amount the Government proposes.[124]  Fourth, the government in this matter has accepted the face value for every single other ticket or charged item at issue -- to concerts, basketball games, drinks and food.  The government has never discounted the value of a ticket because the team in question was no good, there was a glut of tickets (thus potentially depreciating the market value) or the second-hand market was soft.  Finally, the government's own trial witness acknowledged paying $75 per ticket for these very tickets.

As a preliminary matter, Mr. Coughlin should only be held responsible for *one*, not two tickets.  Mr. Coughlin admittedly attended the game and used one of the tickets.  That is not in dispute.  However, the second ticket allegedly was provided to Coughlin's sister Chrissy.  The government has not provided this Court with a single iota of proof that Mr. Coughlin or his sister ever received this second ticket, or that his sister in fact attended the game at all.  The reason for this utter lack of proof is that Chrissy Coughlin did *not* actually go to this or any other Redskins game, or ever sit in a luxury box.  Moreover, to the extent Kevin Ring considered inviting

---

[124] Two preseason games and eight regular season games. *See* http://www.nfl.com/teams/schedule?team=WAS&season=2001&seasonType=REG & http://www.nfl.com/teams/schedule?team=WAS&season=2001&seasonType=PRE; see also Thomas Heath, *Redskins Raise Ticket Prices; Only Premium Level Seats Are Affected*, Washington Post, Feb. 15, 2001 at D01.

25312648

Chrissy, this invitation came not because of her relationship with Bob Coughlin, but rather because her roommate and close friend Leah Bellair was an invitee and attended the game in the same suite.  Chrissy would have been Leah's guest, not Mr. Coughlin's.  It is patently unfair -- without a shred of proof -- to force Mr. Coughlin to accept responsibility for another's attendance.   As such, Mr. Coughlin should only be held responsible for one ticket, not two, and as such, the cumulative loss amount falls below $5,000.

Even if Mr. Coughlin is somehow held accountable for both tickets, these tickets should simply be valued in the same way every other sporting event and concert ticket is ordinarily valued -- *by the amount on the face of the ticket* -- $77.25 per ticket.[125]  U.S.S.G § 2C1.2 provides little guidance regarding how to calculate the value of non-cash items received.  The commentary to the determination of loss incorporated in U.S.S.G. §2B1.1, to which guideline § 2C1.2 refers, merely states general principles indicating that the "fair market value" of the property may be considered.

By analogy, the Internal Revenue Service focuses on the face value of the ticket and not on more creative valuation theories.  Specifically, when taxpayers attempt to deduct luxury box tickets as a business expense, the Internal Revenue Code states that "[i]n the case of a skybox or other private luxury box leased for more than 1 event, the amount allowable as a deduction … shall not exceed the sum of the *face value* of non-luxury seat tickets for the seats in such box…" I.R.C. § 274(l)(2) (emphasis added); *see also* I.R.C. § 274(n)(1) (using face value to determine extent of deduction).  Similarly, the IRS requires taxpayers to use the fair market value of "fringe benefits," such as sports tickets received from an employer for personal use, when calculating income.  Treas. Reg. § 1.61-21(b)(2).  Sports tickets, however, are rarely the subject of such a

---

[125] Exhibit 23 (Copy of Redskins Tickets).

valuation, because the receipt of one or two sports tickets is generally *de minimus* income and need not be reported.  Treas. Reg. § 1.13206(e)(1).

In this case, the tickets should be valued using their face value.  *First*, this is the obvious first place to look.  Tickets are generally worth the printed amount on their face.  *Second*, there is no market for individual tickets to luxury boxes.  Luxury box tickets are rarely resold and are generally given away or shared by box owners.  When they are resold, it is generally only by the *owner* of the box as a package of all the tickets available for the box.  In light of the lack of a market for the tickets, the face value is generally considered an adequate proxy for their value.  *Third*, even if this Court were to ignore the face value of the tickets, the government's $437 per game price is excessive and far exceeds their value on even a hypothetical market.  The government is confusing "cost" to Abramoff with "value" to Coughlin.  The government's estimate is significantly greater than the cost of the most expensive seat available to the same Redskins game and for the cost of a ticket directly next to, above and below these seats.  There is nothing to suggest that tickets to this particular game between two teams with losing records would be especially valuable or that the tickets were worth three times as much as the most expensive ticket available.[126]  The government's calculation also charges Mr. Coughlin with a pro rata share of *every benefit* the luxury box owner holds—even though Mr. Coughlin did not share in all (let alone any) of those benefits.  Mr. Coughlin was not the owner of the box nor involved in any manner in leasing the suite for the year.[127]  Mr. Coughlin was not able to invite

---

[126] At the time, the Redskins were 0-5, the Panthers were 1-4, and the attendance for the game was 74,480, far below capacity.  *See* http://www.nfl.com/teams/schedule?team=WAS&season=2001&seasonType=REG & http://www.nfl.com/teams/schedule?team=CAR&season=2001&seasonType=REG.  If fair market value is the standard these tickets were worth less than $25 per ticket.

[127] It is universally recognized that suites are leased for the year, and that the benefits the lessor (or owner) derive from the suite have much to do with factors unrelated to the individual tickets themselves.  For example, the suite owner can host functions in the suite, use the suite for events

37

people of his choice or control the entire luxury box.  Mr. Coughlin *only* enjoyed the benefit of

attendance to the game at Mr. Ring's discretion, which necessitates some discount from a full

pro rata share.  All he did was attend a single game.  Given these significant limitations, the face

value is the most accurate representation of the actual value of the tickets.

Even the National Football League, Pro-Football Inc., the Washington Redskins and WFI

Stadium themselves, in a formal letter to the government, disagree with the government's

position.  In response to what appears to be a federal grand jury subpoena, the Washington

Redskins informed the government that although the face value of the tickets in question here

was $77.25, these were valued more than a nearly identical ticket in equivalent general

admission seating.  Nearly identical (if not better) seats had a face value of $65.  Thus, the

Redskins already credited any additional benefits of suite-seating in their ticket valuation by

increasing the value from $65 to $77.25.  Valuing these tickets at $437 per ticket is in no way

accepted by the National Football League or the Redskins.[128]

Also of note is testimony of the government's own witnesses during the Ring trial on this

very subject.   During the trial, Assistant United States Attorney Leotta solicited testimony from

Gregory Harris, formerly the Deputy Director at OIPL and at one time Mr. Coughlin's boss.

Harris testified that he too took the very same Redskins tickets in the Abramoff suite (for a

different game) from Kevin Ring but allegedly paid for them.  (Harris testified that he wrote a

---

other than a Redskins game (such as a concert, a car show or a soccer game) and otherwise
entertain using the suite.

[128] Exhibit 22 (May 12, 2008 Letter from the D. Donovan (Washington Redskins) to Jason
Highly (Special Agent, U.S. Dept. of Justice, OIG).  Interestingly, and disturbingly, although the
government was in possession of this letter and valuation as of May 12, 2008, it chose not to
share it with Mr. Coughlin until November 12, 2009.  Even during heated plea discussions that in
part turned on this very issue, the government held this document and its content closely.  The
government elected not to disclose it (even though it was in its possession) when this issue arose
at the guilty plea before this Court.  See 04/22/08 Tr. 9-10 (plea proceeding).  It appears that it
was only after Mr. Coughlin submitted his Comments and Objections to the PSR to Ms. Moses-
Gregory that the government saw fit to disclose this information.

check but the trial record reflects that no such check was ever cashed by Ring.  The government

has not charged Harris for any criminal conduct.)  Harris apparently paid only $75 per ticket for

four tickets.[129]  A close review of the trial transcript and court filings in the Ring case makes

clear that the government and AUSA Leotta have never challenged that valuation or suggested to

the jury or the Court that the $75 per ticket figure was anything but proper.  The government

does not appear to have opened a tax case into Mr. Harris' acceptance of goods well below the

government's theory of valuation. The government lawyers clearly accepted $75 per ticket as

sensible when it worked for them.  Moreover, Mr. Harris' actions demonstrate that had Mr.

Coughlin tried to pay for his ticket to the game, the only rationale way to calculate the value

would have been to look at the face value -- like Harris did -- and pay $77.25.  Oddly, what is

good for the goose in the Ring trial is no longer good for the gander in the Coughlin sentencing.

The government should be held to some standard of consistency and thus should accept the

$77.25 per ticket figure as appropriate.

Indeed, even the *current* Senate Ethics Rules, which are far more restrictive than those in

place at the time Mr. Coughlin received the tickets, suggests that the face value is the appropriate

measure.  These very rules were adopted in the wake of the Abramoff scandal.  Specifically, the

Senate Ethics manual states that, for reporting purposes, *a ticket should be valued by its face*

*value along with any parking and food benefits received.*  Sen. Ethics Manual (2009) at 59-60.

Bizarrely, the government seeks to rely on an Office of Government Ethics ("OGE")

Opinion adopted in February *2007*, more than five years *after* Mr. Coughlin attended the

Redskins-Panthers game in October 2001.  For the reasons set forth below, applying this OGE

Opinion would be error.  First, this opinion did not go into effect until 2007 and thus should be

disregarded because it was not even in place at the time the relevant offense conduct took place.

---

[129] 09/22/09 Ring Trial Tr. 18 (PM Session).

Fundamental rules of fairness, *ex post facto* applicability and basic notice preclude the applicability of such an OGE Opinion.  Second, for obvious reasons, Mr. Coughlin was completely unaware of this Opinion and never was put on notice about it.  He never received any training on the subject.   Even if he had tried to pay for his ticket, he could not have known about this non-existent Opinion and thus would have done what Harris did and paid the $77.25 face value.  Moreover, the Opinion itself states in its very first sentence that there was disagreement amongst federal agencies as to how to value suite tickets.  Contrary to the government's assertions, there was no consistency as to valuation methodology.  It is clear that OGE issued this Opinion in response to the wave of Abramoff cases.  While such an Opinion arguably applies to conduct after 2007, it certainly cannot apply to prior conduct.[130]

For these reasons, the two Redskins tickets should be valued at $154.50.  The total value of the "loss" for sentencing purposes should be found to be less than $5,000, and the offense level should only be increased by one level, not two.

## 2.   The History and Characteristics of Mr. Coughlin Support A Departure Below the Guidelines Range

As set forth in details above, see supra § I, Mr. Coughlin devoted his life to public service and helping others.[131]  From his undergraduate degrees in political science and international affairs, to his work on the Hill, to his law degree and then his return work on the Hill and at DOJ, Mr. Coughlin has always immersed himself into public service jobs.  As made clear in the letters of his friends, family and former colleagues, his passion and commitment were admirable. This

---

[130] It is again worth noting that it does not appear that the government has held its own trial witness Gregory Harris to these standards.  First, Mr. Harris did not even successfully pay for the tickets, given that Ring rejected his payment.  Second, even if Mr. Harris did in fact try to pay for the tickets, he valued the tickets at $75 apiece.  Finally, the government at no time has corrected that valuation.  Mr. Coughlin challenges the government to provide evidence that it required Mr. Harris to abide by the OGE Opinion or pay the artificially elevated "market value plus" calculation.

[131] Details related to Mr. Coughlin's background and personal characteristics are set forth supra in Section I.  To avoid repetition, they are not discussed in detail again here.

commitment to public service cuts against jail time.  Mr. Coughlin's passion for government service was sincere.  Although it was here that Mr. Coughlin got himself into trouble because of Kevin Ring, his loyalty to public service should be credited to him.

Mr. Coughlin's life-long dedicated community service and charitable efforts also should be considered as powerful mitigation in this Court's sentencing determination.  Mr. Coughlin very much has "walked the walk" here and the Court truly gets a glimpse into his soul and personality through his charitable works.  As detailed in Section I.C. above, his "strong commitment to helping others"[132] did not conveniently begin just prior to his sentencing here, but rather as always been a central part of his life.    His work in Salvation Army soup kitchens, his delivery of holiday meals to "shut-ins," his tireless efforts to assist the fundraising efforts of friends, his fundraising for underprivileged children yearning for a summer camp experience, his incredible work for  "Natural Ties" (both in Kansas City and then starting the Northwestern University chapter), his commitment to Charlie, his efforts on behalf of battered women, his delivery of food to D.C. homeless, his activism in Christ Church, delivered food to the homeless every Monday night through his church, Christ Church in D.C., his tutoring and mentoring of a D.C. student in need of special assistance, his adopting a military family through Walter Reed Hospital, his actively participation in the USO gift program, his annual work on the Adopt-an-Angel program all provide insight into Mr. Coughlin's character -- factors that weigh heavily against any term of imprisonment.

Any period of incarceration not only will hurt Mr. Coughlin, Katherine, Grace, his mother Jo Ann and the rest of the family, but also will punish those in the Kansas City community that Mr. Coughlin helps on a regular basis.  Jail time hurts, not helps his community.

---

[132] Exhibit 11 (Letter from C. Wollard).

His meal deliveries will have to stop.  "Shut-ins" in need of assistance getting into bed or paying

bills will no longer have Mr. Coughlin to help them.

**3.**       **The Nature and Circumstances of the Offense Support A**
              **Departure Below the Guidelines Range**

The nature and circumstances of Mr. Coughlin's offense conduct also weigh strongly in

favor of leniency, and specifically, no additional jail time.  As set forth in detail above, and as

made clear during the trial of Kevin Ring, Mr. Coughlin was not in a position to make decisions

or influence policy.   Mr. Coughlin's crime was quite simple:  he made a mistake of judgment

and accepted a relatively small dollar figure worth of meals and tickets to events from an old

friend.  He did so while at the same time having particular work in front of him from that same

friend.  Mr. Coughlin repeatedly has accepted responsibility for his actions and recognizes that

he violated the conflicts of interest statute when he took these actions.  However, at the time he

did not accept these items to influence his decision-making.

Moreover, when compared with the conduct and actions others caught up in the wider

Abramoff scandal, Mr. Coughlin's criminal conduct was de minimis.  He did not lie to

investigators.  He did not accept bribes or gratuities.  He did not seek to push through

questionable legislation or knowingly help private clients.  He did not compromise the honest

services he owed his government.  Similarly, as disclosed in the Kevin Ring trial, individuals

who apparently acted in ways far more serious and egregious than Mr. Coughlin have not been

charged or held responsible.  Sending Mr. Coughlin to jail where he made no decisions, and

allowing others who clearly made the decisions based in part on Ring's lobbying would be a

miscarriage of justice.[133]

---

[133] At multiple points during debriefing sessions, AUSA Leotta, in commenting on the nature of
the offense, made clear that he did *not* believe the offense conduct warranted jail time.

Although Mr. Coughlin contends that the nature and circumstances of the conduct weigh against jail time, that in no way is to suggest Mr. Coughlin does not fully accept responsibility for his conduct.  Mr. Coughlin's acceptance of responsibility is not at issue here.  He repeatedly has acknowledged his role in the conduct.  He always has readily admitted he took the items in question from Kevin Ring.  Likewise, he never has distanced himself from the actions he took, however minimal, while at the Department of Justice.  He acknowledged his actions on the very first day he was interviewed by law enforcement agents, even while he was still an attorney at the Department of Justice.  He also acknowledged his actions through counsel over and over again during plea discussions.   He waived indictment and pleaded guilty pursuant to an Information, relieving the government of any need to indict.  On April 22, 2008, in front of this Court, without any hesitation, he raised his right hand and took responsibility for his actions during the plea proceedings.  Likewise, Mr. Coughlin's public statement after his plea in no way distanced him from his acceptance.

Moreover, his acceptance of responsibility did not end at the courthouse steps that day. After the plea, he met repeatedly with Department of Justice attorneys and law enforcement agents during proffers, debriefing and preparation sessions.  Throughout the entire process of this investigation, prosecution, plea and cooperation, Mr. Coughlin has continuously shown respect and candor with this Court and with Pretrial services.  As is noted in the PSR, Mr. Coughlin has been compliant with every single condition of his release.  His economic conditions have required him to move on several occasions; prior to each move, he has promptly notified PreTrial Services.

During his PreSentence Interview, Mr. Coughlin repeatedly orally took responsibility for his conduct.[134]   Likewise, in a written statement to United States Probation Officer Renee Moses-Gregory, in connection with her completion of the PSR, Mr. Coughlin wrote:

> I wanted you to know that I accept full and complete responsibility for my actions that led to my guilty plea.  I unequivocally accept responsibility for my conduct.  I am very sorry.  Specifically, between 2001 and 2003 I took some sports tickets, concert tickets, meals and drinks (amounting to around $4,000 [sic]) from a very old friend of mine -- Kevin Ring.  At the time I took these items, I worked at the Department of Justice and Kevin had business in front of the Department and me.  Even though I had absolutely no idea that Kevin was leveraging our relationship for client purposes, I recognize that by taking these items while at DOJ, I engaged in a violation of the conflict of interest statute.  As I have acknowledged on numerous occasions to the prosecutors and law enforcement agents, as well as to the Court at my guilty plea, I am embarrassed and disappointed in my lapse of judgment and my actions, and am sorry for having taken these actions.  One of the many ways I have tried to demonstrate this full acceptance of responsibility is by my affirmative and active efforts to cooperate fully with the government and provide substantial assistance in the investigation and prosecution of others.  Needless to say, I wish I had never taken these items from Kevin.  I have learned many lessons and look forward to rebuilding my life, with my wife and baby daughter by my side.[135]

Additionally, as noted above, the agreed-upon Guidelines Range further demonstrates that the nature and circumstances of the conflict of interest are of a different kind and nature of other so-called corruption activities associated with Jack Abramoff.   Mr. Coughlin never influenced policy, decision-making or legislation of any kind.  Moreover, when the D.C. Board of Examiners for the Bar was called upon to evaluate Mr. Coughlin's conduct,  the Board concluded that it was not moral turpitude *per se*, noting the many open questions about the minimal nature of his conduct.  When viewed in this light, the nature and circumstances of Mr. Coughlin's conflict of interest offense suggest lenient treatment at sentencing.

---

[134] PSR ¶ 40.
[135] Id.  Mr. Coughlin's reference to "$4,000" and not "$4,800" was a typographical error and not any effort to minimize his conduct.  Given that he has acknowledged the $4,800 figure repeatedly in this case, it is far fetched for the government to now accuse him of trying to push that figure down  in this manner.

Finally, as described above, it is worth noting that Mr. Coughlin sought ethics guidance on several occasions while at the Department of Justice.  This certainly is not the behavior of someone setting out to intentionally violate the law or defraud the government in any way.  He sought guidance from his ethics officer about attendance at a golf event and when he was told he could not attend, he did not go.  Similarly, he -- like so many other high ranking Department of Justice officials -- operated under the erroneous impression that the pre-existing friendship ethics rules of the U.S. Senate also applied at the Department of Justice.[136]

**4.      There Is No risk of Recidivism, Thus Supporting a Non-Jail Sentence**

Mr. Coughlin's criminal conduct truly brings with it no chance at all of recidivism.  As the Court is aware, Coughlin took perks from his friend Kevin Ring while having Ring's lobbying business in front of the Department of Justice.  If ever there was a case where a lesson was learned -- admittedly the very hard way -- this is it.  It is fair to say that Mr. Coughlin will never again take a drink, let alone a meal, a ticket or anything like that, from someone having business anywhere near him or his employer.   Not only has Mr. Coughlin acknowledged his mistakes, but he has beaten himself up so repeatedly that there is no chance there could be a repeat, even unintentional, of the conduct.   Moreover, to the extent Coughlin ever seeks ethical guidance, he will obtain it in writing and be certain to adhere to the spirit and strict letter of that guidance.

Additionally, assessing Mr. Coughlin's life in its entirety demonstrates that there is no risk of recidivism.  Studies have demonstrated that the vast majority of white collar offenders, like Mr. Coughlin, pose little risk of recidivism.  See e.g., Peter J. Henning, Prior Good Works in the Age of Reasonableness, 20 Fed Sent'g Rep. 87 (2008); Ellen S. Podger, Throwing Away The Key, 116 Yale L. J. Pocket Part 279 (2007).  Moreover, Mr. Coughlin is a first-time offender,

---

[136] These issues are discussed in greater detail in Section II.C. below.

which strongly suggests that he does not have a great risk of recidivism.  The U.S. Sentencing

Commission analysis, published in 2004, acknowledges that defendants who are in Criminal

History Category I, like Mr. Coughlin, have the lowest rate of recidivism of all offenders.  See

U.S.S.C., Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing

Guidelines, at 6 (2004).  The Commission's finding that possible sentence reductions for "first

offenders" are supported by the recidivism data and would recognize their lower offending rates.

Id. at 15.  This is another factor in this case that supports leniency and a departure from the

guidelines range.

The Commission's analysis went on to consider other factors that may have an impact on

a criminal defendant's likelihood of re-offending.  When the Court considers Mr. Coughlin's

age, his long history of continuous employment, his educational attainment (graduating from a

top university and law school), and his marital status, Mr. Coughlin falls within the category of

offenders least likely to recidivate.  The Commission has acknowledged that employment status,

educational attainment, and marital status each have the potential to affect recidivism rates and in

each of those categories.  Id. at 12.  Indeed, Mr. Coughlin falls into the lowest category that

exists and makes the statistical likelihood of recidivism for Mr. Coughlin less than one percent.

Finally, Congress recently expressed a preference for offenders like Mr. Coughlin to

reduce the amount of time spent in prison.  The Second Chance Act of 2007, Pub. L. No. 110-

199, 122 Stat. 657 (2008) sent a strong signal that discouraged confinement for white-collar

offenders in situations like this, and that age, likelihood of recidivism, rehabilitation, and the risk

of community harm are valid sentencing considerations.  The legislative history of the Act made

clear that given the overwhelming financial burden placed upon the federal government by

prison overcrowding, non-incarceration sentences should be carefully considered.[137]  Given Mr.

Coughlin's background, the minimal likelihood of recidivism, the virtually nonexistent risk of

community harm, the overburdened federal prison population, and the direction suggested by

The Second Chance Act, a non-incarceration sentence is warranted here.

### 5.        A Sentence Of Incarceration Will Destroy His Family

Placing Mr. Coughlin in jail will shatter his family, and devastate his wife and brand new

baby girl.  Moreover, it will punish his mother who is fighting Parkinson's disease.  Indeed,

incarceration, in many ways, will punish them far more than it will punish Coughlin.  His family

will suffer the most.  As John Martin, former U.S. Attorney and United States District Judge for

the Southern District of New York publicly stated:

> Every sentence imposed affects a human life and, in most cases, the lives of
> several innocent family members who suffer as a result of a defendant's
> incarceration.  For a judge to be deprived of the ability to consider all of the
> factors that go into formulating a just sentence is completely at odds with the
> sentencing philosophy that has been the hallmark of the American system of
> justice.

John S. Martin, Jr., <u>Let Judges Do Their Job</u>, N.Y. Times, at A31 (June 24, 2003) (2003 WLNR

5657759).  Mr. Coughlin's family is a real-life example of Judge Martin's point.  Katherine

Coughlin will become a single mother with thousands of dollars of debt and virtually no sources

of income.  Currently, Mr. Coughlin holds two jobs just to make ends meet and to build for his

future.  One is to pay the bills on a daily basis.  The other is as an investment for down the road.

---

[137] "The Federal prison population has increased more than seven-fold over the past 20 years"
and "expenditures on corrections alone increased from $9 billion in 1982 to more than $50
billion today." H.R. Rep. No. 110-140, pt II, at 2 (2007).  As Rep Sheila Jackson-Lee -- one of
the Act's original co-sponsors -- explained, "Congress sought through The Second Chance Act to
reduce "considerable government expenditures on warehousing prisoners." 153 Cong. Rec.
H13564, 13580 (daily ed., Nov. 13, 2007).

Incarceration would eliminate current and future income prospects and would severely further punish his family.[138]

Additionally, it is important to the emotional development of Mr. Coughlin's daughter that he is not incarcerated.  Sociological studies repeatedly have demonstrated that children from two-parent families are better off emotionally, socially and economically.[139]  There can be little doubt that Grace will be better served by having two parents and not lose her father even for a short period of time.

There can be no question about the kind of father that Mr. Coughlin is.  As detailed above in Section I.B., even before he had Grace, Mr. Coughlin had a way of touching children.  His friends and family trusted Mr. Coughlin -- "the baby whisperer" -- with their most prized possession, their children.  Over the last five months, it has been clear to anyone who has come within his orbit, that Coughlin is a doting, devoted and loving father.  Katherine, his sister Chrissy, his parents, his in-laws and friend after friend all describe a man whose life revolves around his baby girl.  It cannot be underestimated the effect even a brief period of incarceration would have on him and his family.

Katherine Coughlin is also terrified of the effect a term of prison will have on Mr. Coughlin, herself and on their baby Grace.  In her letter to the Court, Katherine first explained the emotional impact on the family if her husband were to go to prison.  The fact that the felony conviction has destroyed Coughlin's future of public service and shattered his confidence with friends and family is already real punishment.  But sending Coughlin to jail, in Katherine's

---

[138] Unlike many white collar cases where the defendant's family benefited from alleged fraud, here neither Katherine nor Grace were the beneficiaries of a single penny at issue in this case. Mr. Coughlin had not even met Katherine when the offense conduct occurred.  Likewise, baby Grace was not even born until eight years after the offense conduct.  They should not be hurt further by a sentence of incarceration.

[139] See *The Future of Children*, Volume 15, No. 2, September 2005 (joint publication of the non-partisan Brookings Institution and Princeton University's Woodrow Wilson School), available at http://www.princeton.edu/futureofchildren/publications/docs/15_02_FullJournal.pdf.

estimation, could lead to additional emotional consequences and could severely strain the family.[140]

Also, as noted above, Mr. Coughlin's mother recently was diagnosed with Parkinson's disease. Like his ceaseless efforts to get his sister through cancer five years ago, Mr. Coughlin hopes to be a rock by his mother's side. Chrissy, Mr. Coughlin's father and others also are relying on Mr. Coughlin to be that steadying and unifying influence. Incarcerating Mr. Coughlin, even for a short period of time, will put his family and his mother under significant additional strain.[141]

The financial toll that this investigation, prosecution, and guilty plea have taken on the family already is significant and cannot be understated. The family has watched as their personal finances have deteriorated to the point where they have stayed in the homes of friends and family. They were forced to sell their home and have, over the past two years, moved a number of times. While they are a strong family, these moves have taken a toll on Katherine. But, as Katherine made clear in her letter to the Court, she and Mr. Coughlin are as strong as ever and will continue to fight on together.

Katherine also laid out the serious financial consequences of incarceration, especially given that Mr. Coughlin is the sole breadwinner -- albeit limited -- at this time, given the recessionary economy. She described the strain that the conviction and any sentence of incarceration would place on family finances.[142] As she stated in her letter to the Court:

> We have had no income for long periods of time throughout this ordeal, and we have had to accept help from family and friends. We have lived in several different apartments and in several different guest rooms with friends and family who want to help. Bob has worked hard at a job search during this time. However, looking for a job during a recession and telling employers he

---

[140] Exhibit 1 (Letter from K. Coughlin).

[141] It is worth noting that Mr. Coughlin's mother Jo Ann did not raise this issue in her October 29, 2009 letter to the Court.

[142] Exhibit 1 (Letter from K. Coughlin).

is a felon has made his search almost impossible.  Recently, he has had some
success with a potential employer.  However, if he were to be incarcerated, that
would destroy this potential opportunity for him to start over financially.  I
have been searching for a job because of the huge strain on our finances, but it
has been difficult to find time for an extensive job search of my own with a
newborn.  . . . If Bob is incarcerated he would again be unemployed and I
would be without any help with Grace while I conduct my own job search in a
challenging recession.  So the emotional consequences of Bob being
incarcerated are what I fear most because I'm not certain he would ever
recover emotionally.  However, the financial consequences of Bob being
incarcerated are extremely dire as well and also keep me up at night.[143]

Courts have long recognized the significant impact that incarceration has on the families

of the defendants and acknowledged that there are circumstances where the loss of caretaking or

financial support to a family may warrant a departure.  See e.g., United States v. Dyce, 91 F.3d

1462, 1473 (D.C. Cir. 1996) (nothing that the impact of imprisonment on a defendant's family is

profound, imposing financial and emotional hardship) (Judge Wald Dissenting); United States v.

Gauvin, 173 F.3d 798 (10th Cir. 1999) (departure warranted to minimize the impact on the

defendant's children in case where defendant financially supported wife and children and worked

long hours); United States v. Sclamo, 993 F.2d 970 (1st Cir. 1993) (departure warranted based

on the defendants significant relationship with and responsibilities to lover's child).

While family ties are not ordinarily relevant in determining whether a departure may be

warranted, under U.S.S.G. § 5H1.6, Courts have often found exceptional circumstances in

situations quite similar to that in the Coughlins' household.  Here, Mr. Coughlin is the primary

financial provider for his wife and their daughter Grace.  At this developmental moment, having

both parents around is of significant benefit.  Courts have repeatedly held that situations similar

to this one may be such to warrant a departure for exceptional family circumstances.  For

example, in United States v. Greene, the Court provided for a non-custodial sentence in a case

where the defendant was the sole provider of financial support for his three children.  The Court

---

[143] Id.

50

in that case found that because of the defendant's responsibilities to his children, combined with the lack of any prior criminal history points, a non-custodial sentence was sufficient to serve the aims of deterrence and retribution.  249 F. Supp. 2d 262 (S.D.N.Y. 2003).  Another Court, in United States v. Galante, upheld a departure for exceptional family circumstances where, like here, the defendant was the primary earner, and where, like here, the defendant's wife and children were dependent on his income, and where, like the instant case, the family was at risk of losing their housing without his income.  111 F.3d 1029, 1031 (2d Cir. 1997).

As noted throughout this submission, Mr. Coughlin already has been punished for the offense conduct.  His life-long dream of public service has been destroyed.  He has been unemployed for much of the past two years, placing his wife, daughter and family in financial distress.  Mr. Coughlin's conviction has led directly to the suspension of his law license. Notwithstanding the nature of the conviction and the facts underlying it, there remains a chance that he will never regain that law license.[144]  As this Court is aware and instructed Mr. Coughlin during his plea, a felony conviction also brings with it additional collateral consequences.  Mr. Coughlin lies awake at night worrying that because of his conviction, community rules might prevent him from coaching his daughter's soccer team some day, or prevent him from being a "room parent" in elementary school.  Equally as important, Coughlin has been emotionally punished for his actions.  Coughlin did not set out to commit a crime, wrong the public or defraud the government.  But his trust in an old friend led to his downfall.

---

[144] See footnote 15.

C.    **Mr. Coughlin Provided Substantial Assistance In the Investigation and Prosecution of Others and Warrants a Reduction Pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C.  §  3553**

Mr. Coughlin has, by any reasonable definition, "provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1.  He has met each and every one of the obligations set forth in his plea agreement as well as the applicable 5K1.1 standards.  The government has made a "5K" motion to this Court acknowledging Mr. Coughlin's substantial assistance.  Moreover, on September 1, 2009, during preparation for potential testimony for the Kevin Ring trial, Assistant U.S. Attorney Michael Leotta expressly stated to Mr. Coughlin: "you already have earned your 5K letter.   There is nothing you can do to have that taken away."  As such, Mr. Coughlin respectfully requests that this Court downward depart substantially below offense level six.

On approximately ten occasions between March 2007 and September 2009, Mr. Coughlin met with and provided substantial assistance to federal government attorneys and law enforcement agents.  At the request of the government lawyers, he repeatedly traveled thousands of miles to D.C. to assist the prosecutors and agents.  He reviewed hundreds of e-mails with them.  Mr. Coughlin put the e-mails into context, described the events underlying the e-mails and explained the state of mind of himself as well as others.  Specifically, Mr. Coughlin answered literally hundreds of questions about Kevin Ring and other individuals.[145]  Among other items, to the extent he could, he answered questions about legislation, Department of Justice grant money, and immigration issues.  He shed light on the conduct of literally dozens of current and former Department of Justice officials many of whom also took items of value from Kevin Ring.  Mr. Coughlin's assistance regarding Mr. Ring came both before and after charges were filed against

---

[145] Admittedly, there were a number of people about whom Mr. Coughlin could not provide any assistance.  For example, Mr. Coughlin does not believe he ever met Jack Abramoff and is certain he never had any kind of substantive conversation.  As such, there was literally nothing he could share with the government about Abramoff.

52

Ring in late 2008.  Mr. Coughlin spent countless hours looking at expense reports and

entertainment receipts. He reviewed photographs and DVDs of sporting events.  Whatever was

asked of him, he did.

Mr. Coughlin also assisted the Department of Justice, Office of Inspector General, in its

investigation into certain alleged politicization of hiring policies of  President George W.  Bush's

Justice Department.  Mr. Coughlin spent considerable time with OIG agents, not only answering

questions and providing information about the hiring practices but also assisting the agents in

developing protocols for improving hiring in the future and removing the politicization of such

hiring.  Ultimately, Mr. Coughlin's guidance was included in an report issued by the Inspector

General on this very topic.

The government alleges that Mr. Coughlin's cooperation is somehow suspect because he

failed to recall specific language in e-mails about events that took place over seven years prior to

the debriefings.  First, Mr. Coughlin made every effort to refresh his recollection about the e-

mails and underlying events.  He studied the e-mails, supporting documentation and calendar

entries.  But Mr. Coughlin sent and received literally thousands of e-mails during this time

period and his failure to remembering minutiae makes perfect sense.  Moreover, these events

took place in some cases more than seven years before the government's questioning.  Finally,

Mr. Coughlin maintains that it would have been more suspect had he retained a miraculous recall

of these e-mails and events, rather than the more understandable failure to remember specific

words from very old correspondence.  His failure to recall on occasion certainly should not be

held against him, but rather should be credited as a hallmark of his truthfulness during this

difficult process.

Mr. Coughlin satisfied every single element of his April 4, 2008 plea agreement.

Specifically, he:

- Provided complete, truthful and candid disclosure of information and all records, writings, tangible objects or other requested materials of any kind or description that he has which relate directly or indirectly to the subject of this investigation, including financial records and tax returns;

- Answered completely, truthfully and candidly all questions put to him by attorneys and law enforcement officers upon request;

- Made himself available for interviews by attorneys and law enforcement officers upon request;

- Did not attempt to protect any person or entity through false information or omission, nor falsely to implicate any person or entity;

- Complied with any and all reasonable requests from federal government authorities with respect to the specific assistance that he was asked to provide;

- Answered at trial, before the grand jury or at any hearing arising out of an investigation, all questions put to him by the Court or by the attorney for any party completely, truthfully and candidly.[146]

### 1. Mr. Coughlin's Absolute Candor and Honesty with the Government In No Way Undermines His Acceptance of Responsibility or His Cooperation.

Mr. Coughlin has always been completely honest with the government lawyers and investigators. The government, however, maintains that such candor is inconsistent with acceptance of responsibility and cooperation , and somehow should be held against Mr. Coughlin as this Court weighs the sentencing factors. This view of cooperation -- that truth-telling is only good when it helps the government -- is anathema to our system of justice and should be rejected.

Critically, Mr. Coughlin was absolutely honest during every moment of his cooperation. Unlike many federal cooperators, Mr. Coughlin did not have several versions of the truth, which evolved over the course of a number of government meetings or proffers. Rather, Mr. Coughlin was one hundred percent consistent -- and truthful -- from the first meeting through the very last. Additionally, and unlike many cooperating witnesses under the proverbial gun, Mr. Coughlin

---

[146] Exhibit 24 (April 4, 2008 Plea Agreement of Robert Coughlin § 4).

refused to say things he thought the government would have wanted him to say.  He certainly did

not pander to the government; rather, he answered every question truthfully and completely.   On

several occasions, most notably during mock cross-examination during trial preparation, this

candor alienated him from the government.  Yet, rather than caving to aggressive questioning

and changing his tune, Mr. Coughlin maintained his integrity and stood by his truthful

statements.

Specifically, Mr. Coughlin's full cooperation candor is most evident in four discreet

areas.  These areas were highlighted in a September 4, 2009 letter written by the Department of

Justice prosecutors in the Kevin Ring trial to defense counsel for Kevin Ring, just prior to Ring's

federal trial before this Court.[147]  It is important to make clear that Mr. Coughlin's comments set

forth in this September 4th letter were made during mock cross-examination in preparation for his

potential testimony at the Ring trial.  Department of Justice Trial Attorney Michael Ferrara

skillfully baited Mr. Coughlin and led him into his comments.  Mr. Coughlin's ire and frustration

came out and Mr. Coughlin made several remarks which -- although one hundred percent

accurate -- apparently concerned the government lawyers who were under great stress preparing

for the Ring trial just days before opening statements.

First, Mr. Coughlin has always maintained that *at the time he committed the actions*, he

did not have an awareness that he was violating federal criminal law.[148]  Since the time he was

first approached by the law enforcement agents and prosecutors conducting this investigation,

---

[147] See Exhibit 25 (September 4, 2009 disclosure Letter from Department of Justice Trial
Attorney Michael Ferrara to Andrew T. Wise and Timothy P. O'Toole, counsel for Kevin Ring).
[148] Mr. Coughlin has **always** held this position.  Even through contentious plea discussions which
at times included explicit threats from the government, Mr. Coughlin held this line.  Had the
government had an issue with this position, it had ample opportunity to raise it prior to the plea,
at the time of the plea or even during multiple post-plea proffers. Indeed, the prosecutors had an
affirmative obligation to this Court to object to Mr. Coughlin's entry of a guilty plea if they
believed Mr. Coughlin's position was inconsistent with an acceptance of responsibility.  Yet they
did not do so because Mr. Coughlin's position was not inconsistent with acceptance of
responsibility; rather, it reflected his honest assessment of his state of mind in 2001 and 2002.

and made aware of the full scope of Kevin Ring's conduct (including billing receipts, internal Greenberg e-mails, etc.), Mr. Coughlin has acknowledged that *in hindsight*, he fully understands how his conduct violated the conflicts of interest statute -- 18 U.S.C. § 208.  Mr. Coughlin is aware that this dichotomy between what he knew then *versus* what he knows now is frustrating to the prosecutors; however, he has not let that frustration alter his candor.  Moreover, Mr. Coughlin is well aware that he easily could have shifted his answers to encompass that *at the time* he knew his actions were wrong.  But he simply is unable to do so.  This honesty, however, is in no way a step away from full acceptance of responsibility.  He fully acknowledges his conduct and has always done so.  Indeed, Nat Edmunds, one of the prosecutors in the Ring trial, informed this Court during the Ring trial that Mr. Coughlin was not in fact claiming he did not commit a crime; rather, as Mr. Edmunds explained to this Court, Mr. Coughlin maintained that he did not believe he had the intention of committing a crime at the time he committed the acts which led to the criminal conduct.[149]

Second, Mr. Coughlin has told the government that he believes the government unfairly singled him out as the sole Department of Justice employee charged in the Abramoff investigation, and with the decision to charge him with a felony and not the lesser-included and available section 208 misdemeanor.[150]  This is true as a factual matter:  Robert Coughlin to date is the *only* former or current Department of Justice official charged in the Abramoff investigation.   As the record at the Kevin Ring trial made clear, Mr. Coughlin held no decision-making authority nor any control over any Department of Justice  legislation or initiatives.  Rather, Mr. Coughlin simply served as a liaison or conduit between the public and other

---

[149] 09/28/09 Ring Trial Tr. 22.  Edmonds sharply disagreed with Ring's lawyer's characterization of Coughlin's statements that Coughlin did not commit a felony.  Rather, Edmonds noted that Coughlin acknowledged having committed the acts and the dispute was a narrow and nuanced one over intent.

[150] Exhibit 25 (September 4, 2009 disclosure Letter from Department of Justice Trial Attorney Michael Ferrara to Andrew T. Wise and Timothy P. O'Toole, counsel for Kevin Ring).

Department of Justice attorneys or offices.  Likewise, the Ring trial made clear that there were others far higher up the Department of Justice chain that indeed made decisions on matters lobbied by Kevin Ring, Jack Abramoff and others.  And, the Ring trial record and e-mails established that Kevin Ring paid for the concerts, sporting events, golf outings, wine habits, drinks and meals of a number of other Department of Justice officials.  Yet, Mr. Coughlin is, to date, the only such official charged.  Mr. Coughlin is neither falsely denying or frivolously contesting relevant conduct.  Rather, in an emotion-filled moment during mock cross-examination, Mr. Coughlin challenged the government's decision to prosecute *only* him.

It is an interesting question and certainly relevant as to why the government has pursued this charging strategy.  The circumstances underlying Mr. Coughlin's prosecution shed some light on the potential rationale for this charging methodology.  As this Court is aware, Mr. Coughlin had either worked for or maintained close personal relationships with a number of Department of Justice officials, including Ken Wainstein and Jeffrey Taylor (the U.S. Attorneys for the District of Columbia), Alice Fisher (the Assistant Attorney General for the Criminal Division at Main Justice) and Chuck Rosenberg (the U.S. Attorney for the Eastern District of Virginia).  As a result, each of those offices ultimately decided to recuse themselves from handling any aspects of the Coughlin investigation.  The result was that the matter was transferred to the U.S. Attorney's Office for the District of Maryland.  Moreover, even the U.S. Attorney there -- Rod Rosenstein -- recused himself from the matter, leaving supervision in the hands of an acting U.S. Attorney.  As such, the decision to prosecute Mr. Coughlin was made by attorneys not responsible for investigating other Department of Justice officials or comparing Mr. Coughlin's conduct to others.  He, by the nature of the recusals, was singled out for prosecution.  It very much remains an open matter whether Mr. Coughlin's conduct would have

57

been prosecuted at all  by the Public Integrity Section of the Department of Justice or another prosecutor.

In the same vein, the prosecutors elected not to charge Mr. Coughlin with the available misdemeanor charge, see, e.g., 18 U.S.C. 208 (misdemeanor charge), which squarely covered his conduct and could be viewed as more appropriate given the relatively minor dollar value of meals, drinks and tickets received by Mr. Coughlin over a two year period.  This exercise of prosecutorial discretion understandably frustrated Mr. Coughlin. Rather than swallowing that anger, Mr. Coughlin candidly shared it with the prosecutors on several occasions during his mock cross-examination during final trial preparation.  Coughlin's cooperation agreement did not require him to suppress any frustration or to bottle up his candor; rather, the agreement required him to be truthful at all times.  The government would have this Court conclude that "talking back" to a prosecutor is somehow the equivalent of denying culpability.  That kind of approach has never been countenanced in our federal criminal justice system.  Mr. Coughlin's moments of boiled-over frustration were simply that -- frank talk with the government lawyers. Regardless, Mr. Coughlin nonetheless admitted his conduct, pleaded guilty and repeatedly accepted responsibility for his conduct.   His personal feelings about the prosecutor's exercise of discretion in no way interfered with his ability to step forward and acknowledge his guilt over and over again.

Third, as referenced above, Mr. Coughlin specifically recalls speaking with Department of Justice officials on multiple occasions regarding his ethical obligations while he worked at the Department.[151]  He clearly remembers being familiar with the so-called "pre-existing personal friendship" exception to certain gift rules and sought clarification on whether those rules applied

---

[151] Exhibit 25 (September 4, 2009 disclosure Letter from Department of Justice Trial Attorney Michael Ferrara to Andrew T. Wise and Timothy P. O'Toole, counsel for Kevin Ring).

to him at the Department.[152]  On one of these occasions, Mr. Coughlin asked about the propriety

of his attending a particular golf outing.  He was told that he could not attend.  He followed this

instruction and did not play.[153]  Likewise, Mr. Coughlin recalls discussing the pre-existing

friendship rule in the context of event tickets with a Department of Justice ethics officer.  Mr.

Coughlin remembers being told that he was permitted to take such tickets specifically because he

was not a decision-maker and had no influence on the policies.[154]

　　　The government lawyers were not pleased with Mr. Coughlin's insistence on these facts

during the mock cross-examination on September 2, 2009.  Indeed, the government now

contends that Mr. Coughlin now blames an ethics official for his violations.  He is doing no such

thing.  Rather, on at least one occasion he recalls asking an official about the propriety of taking

gifts from a longtime friend, especially given his understanding of Senate gift rules.  It certainly

would have been convenient and easy for Mr. Coughlin to have changed his memory on this

issue, but he refused to do so.   Notwithstanding Mr. Coughlin's recollections, he acknowledged

his guilty conduct, pleaded guilty and in no way sought to use these events as a defense to his

actions.  Rather, they merely demonstrate Mr. Coughlin's complete candor even in the face of

government pressure.

　　　Finally, the government insisted that Mr. Coughlin plead guilty to a conflict of interest

violation that related to his discussing the prospects of working with Ring and Abramoff at

Greenberg Traurig -- communications that occurred while Mr. Coughlin was at DOJ and while

---

[152] Prior to 2007, it was a well established *Senate* ethics rule that allowed gifts of personal friendship from lobbyists.  Mr. Coughlin had worked on the Hill and in the Senate for a number of years before moving over to the Department of Justice.  Erroneously, he concluded that the same pre-existing friendship rule applied to his longstanding many-year friendship with Kevin Ring.

[153] The government is in possession of the e-mails establishing these facts.  Mr. Coughlin was not permitted to retain them.  As such, they have not been attached to this filing; however, the government is in a position to supply them to the Court and Mr. Coughlin if necessary.

[154] Exhibit 25 (September 4, 2009 disclosure Letter from Department of Justice Trial Attorney Michael Ferrara to Andrew T. Wise and Timothy P. O'Toole, counsel for Kevin Ring).

Ring had business before Mr. Coughlin and the Department.[155]  Mr. Coughlin readily admitted he had conversations with Mr. Ring on the topic, and that he also e-mailed with a family member about the future possibility of law firm employment.  When shown an e-mail, he acknowledged writing it.   However, Mr. Coughlin always has also made clear that he never prepared a resume for Greenberg, never interviewed with anyone from Greenberg, never employed a headhunter, nor took any other steps to pursue such employment.  Indeed, to date, Mr. Coughlin still has no idea where Greenberg's offices are located.  There are no facts that call into question the veracity of those statements.  The government does not dispute them.  By any standard, Mr. Coughlin certainly did not actively pursue employment.  Yet, Mr. Coughlin recognized that he should not even have had a single communication with his friend Ring on the topic, and as such fully acknowledged the conduct in question.  Again, as evident in the government's September 4, 2009 letter to Ring's counsel, the government was not pleased by Mr. Coughlin's candid statements here that emerged during mock cross-examination.  Yet, Mr. Coughlin chose to maintain his honesty.[156]

---

[155] Exhibit 25 (September 4, 2009 disclosure Letter from Department of Justice Trial Attorney Michael Ferrara to Andrew T. Wise and Timothy P. O'Toole, counsel for Kevin Ring).

[156] One additional anecdote is worth recounting to this Court.  During Mr. Coughlin's extensive meetings with the government, AUSA Leotta adamantly and forcefully insisted that Mr. Coughlin admit that he took tickets and attended a Bob Dylan concert.  His sole justification was a strained reading of a casual reference in a Kevin Ring e-mail -- no tickets, no receipts, no real proof.  Mr. Coughlin refused to concede this relatively minor point.  Notwithstanding Bob Dylan's distinguished musical career, Mr. Coughlin simply is not a fan of Dylan's music nor was ever interested in attending a concert.  Moreover, Mr. Coughlin was certain that not only would he never have wanted to attend such a concert, he in fact never did attend a Dylan concert.  AUSA Leotta and Mr. Coughlin went back-and-forth on this topic.  While it would have been simple for Mr. Coughlin to acquiesce to the government pressure here -- simply to make the government happy -- he did not do so.  Ultimately, AUSA Leotta conceded that Mr. Coughlin was right and that he indeed never attended the Bob Dylan concert.  Had AUSA Leotta not conceded this point, undoubtedly Mr. Coughlin's refusal to acknowledge attending this concert too would have made its way into the September 4, 2009 letter as well as its Sentencing Memorandum in this case.  Yet, this event further demonstrates Mr. Coughlin's refusal to bend to any pressure, even if it meant facing the wrath of the very government prosecutor who would make his 5K motion.

"Substantial assistance" certainly cannot mean that Mr. Coughlin must say only that which helps the government, regardless of the veracity of the statements. Indeed, Coughlin's cooperation agreement demands candor, without restriction.[157]   Likewise, there is no case law that permits the government to refuse to water down a 5K letter because the cooperating witness was completely honest, even if it did not help the government's case. The government prosecutors, if faithful to their duties, should value this candor and not shun it. Mr. Coughlin's cooperation agreement requires such honesty, regardless of who it helps or hurts. Thus, "substantial assistance" logically must also encompass information not helpful to the government. Indeed, the existence of so-called *Brady* and Jencks Act obligations implicitly demonstrate that cooperating witnesses will from time to time make statements that either exculpate other investigative subjects or undermine government theories.

Thus, there is no question that Mr. Coughlin provided substantial assistance in the investigation and prosecution of Kevin Ring and others. Mr. Coughlin proffered on a number of occasions. Ultimately, much of what Mr. Coughlin explained and described made its way into the indictment of Kevin Ring.[158]   Mr. Coughlin's assistance on some occasions exculpated investigative subjects, thus in part leading to the decision not to charge them. On other occasions, Mr. Coughlin provided information about officials, yet the Department prosecutors have elected not to charge them -- a decision outside of Mr. Coughlin's control. Mr. Coughlin was willing and ready to testify if requested by either the government or Kevin Ring. Ultimately, he was not called to testify.[159]

---

[157] Of course, had Mr. Coughlin lied during his sessions with the government, the prosecutors would have had the right to void the agreement.

[158] See Indictment of Kevin A. Ring, 08-cr-274-ESH.

[159] Notwithstanding the potential Fifth Amendment implications, counsel for Mr. Coughlin informed counsel for Mr. Ring that he would accept service of a trial subpoena.

61

This cooperation is precisely what was envisioned by Congress in enacting 18 U.S.C. § 3553 and U.S.S.G. § 5K1.1  As such, Mr. Coughlin has earned a downward departure substantially below the total offense level of 6.

**D.** **The Appropriate Sentence for Mr. Coughlin Is "Time Served" with No Term of Incarceration**

Mr. Coughlin has pleaded guilty and accepted full responsibility for his actions.  He has cooperated fully with Department of Justice attorneys and law enforcement agents. When he wakes up each day, he is not proud of his mistakes.  As his wife Katherine wrote to the Court, he is angry at himself and feels he has let her down.  He routinely tells her "You did not sign up for this."[160]  He has lost his job.  He has spent several years trying to find another one.   He has had his law license suspended.  His dream of being a career public servant is for all intents and purposes destroyed.  He most likely will never be able to hold public office, a long-time goal. There are many days he does not want to see or speak with friends, family and colleagues.  He feels he has let them down.  He knows he will feel marked and branded for the rest of his life.

Mr. Coughlin, however, has already begun the process of moving forward with his life. He has found gainful employment, although along a very difference career path.  Indeed, to make ends meet for his young family, he is working two jobs.  He is driven to provide a good life for his wife and infant daughter.  He continues to volunteer and engage in community service activities, as he has done his entire adult life.  At this cross-roads in his life, Mr. Coughlin has finally begun to see the daylight peeking through the storm clouds that have covered him for the past two and a half years.

As described more fully above, additional jail time will destroy Mr. Coughlin's progress and efforts to rebuild.  It will significantly hurt Katherine and baby Grace.  It will hurt the family financially.  It will emotionally destroy him and Katherine even further.  Importantly, it will

---

[160] Exhibit 1 (Letter from K. Coughlin).

serve no community purpose.  A jail sentence is not merited by the totality of facts or existing

case law.  It will not deter additional conduct or provide victims with a sense of retribution.

Rather, it will destroy his family, currently under great personal strain due to the circumstances.

It would be disproportional when compared with others and their criminal activities.[161]

    In contrast, a sentence of "time served" with appropriate supervised release will fully take

into account all of the section 3553 factors.  He will be able to earn a living that will support his

family.

## CONCLUSION

    For the reasons set forth herein, we respectfully request that the Court impose a sentence

of "time served," with no additional jail time.


                                        Respectfully Submitted,


                                        /s/  *Joshua G. Berman*_____
                                        Joshua G. Berman (D.C. Bar # 489751)
                                        Sonnenschein Nath & Rosenthal LLP
                                        1301 K St N.W. Suite 600E
                                        Washington, D.C. 20005
                                        Telephone: (202) 408-5208
                                        Facsimile:  (202) 408-6399
                                        *Attorney for Defendant Robert Coughlin*

---

[161] On April 22, 2008, Mr. Coughlin surrendered to the U.S. Marshals and other enforcement authorities.  Upon his surrender, he was incarcerated, handcuffed and processed by the U.S. Marshals Service, Metropolitan D.C. Police Department and Federal Bureau of Investigation agents.  He was put behind bars and rendered unable to communicate with his wife, family or counsel during this period.  He was advised of certain rights.  Ultimately, this period of incarceration lasted several hours.  Notwithstanding the fact that Mr. Coughlin ultimately was released on agreed-upon bail conditions that day, he nonetheless served enough time to qualify for "time served" under the sentencing guidelines.

25312648